[No. S131818. May 18, 2006.]

SAN FRANCISCO FIRE FIGHTERS LOCAL 798, Plaintiff and Appellant,
v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

654

656

COUNSEL

McCarthy, Johnson & Miller, Diane Sidd-Champion, Daniela I. Kraiem and Raphael Shannon for Plaintiff and Appellant.

John R. Tennant, Jr., for San Jose Police Officers' Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Woodley & McGillivary and Thomas A. Woodley for International Association of Fire Fighters as Amicus Curiae on behalf of Plaintiff and Appellant.

Wylie McBride Jesinger Platten & Renner and Christopher E. Platten for California Professional Firefighters as Amicus Curiae on behalf of Plaintiff and Appellant.

Weinberg, Roger & Rosenfeld, Vincent A. Harrington and M. Suzanne Murphy for San Francisco Police Officers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Dennis J. Herrera, City Attorney, Wayne K. Snodgrass, Burke E. Delventhal, Molly S. Stamp and Linda M. Ross, Deputy City Attorneys, for Defendant and Respondent.

Alisa R. Fong and Jennifer B. Henning for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**MORENO, J.**—In this case, we consider a provision of the Charter of the City and County of San Francisco that requires disputes between the City and County of San Francisco (the City) and unions representing firefighters and other public safety officers, after bargaining to impasse, to be submitted to binding arbitration. An exception to this binding arbitration requirement is any rule or policy "necessary to ensure compliance with . . . anti-discrimination laws." (S.F. Charter, § A8.590-5(g)(3).) We are called on to decide whether a rule changing the method by which applicants are selected for promotion in the fire department falls within this exception. We must also decide the proper standard for reviewing the City's determination, a topic that was addressed at length by the Court of Appeal and by the parties before this court.

We conclude that when read in context, the charter provision in question gives the City considerable discretion to determine what is necessary for ensuring compliance with antidiscrimination laws. Therefore, judicial review of that determination must be deferential, and a rule adopted by the City that is reasonably related to the goal of ensuring compliance with antidiscrimination laws is not subject to binding arbitration. We further conclude that the City's new rule regarding promotion is reasonably related to such compliance, and that therefore the Court of Appeal's judgment ordering the City into binding arbitration must be reversed.

### I. STATEMENT OF FACTS

The below factual background, which is not controverted, is largely drawn from the Court of Appeal opinion. The City's Charter (Charter) charges the City's Civil Service Commission (Commission) with "providing qualified persons for appointment to the service of the City and County." (Charter, § 10.100.) The Commission is mandated to "adopt rules, policies and procedures to carry out the civil service merit system" and, "except as otherwise provided in th[e] Charter," such rules govern the various aspects of hiring and

promotion, including "examinations; eligibility; duration of eligible lists; [and] certification of eligibles." (Charter, § 10.101.)

Section A8.590 of the Charter establishes special collective bargaining procedures for firefighters and other public safety employees, who are denied the legal right to strike. (Charter, §§ A8.590-1 to A8.590-5.) "Notwithstanding any other provisions of th[e] Charter, or of the ordinances, rules or regulations of the City and County of San Francisco and its departments, boards and commissions," the Commission may not unilaterally change any term or condition of employment for these employees but must meet and confer with union representatives. (Charter, § A8.590-4.) If the parties bargain to impasse without reaching an agreement, the matter must be submitted to binding arbitration, as set forth in section A8.590-5 of the Charter. (Charter, § A8.590-5, "Impasse Resolution Procedures.")

■ Critical to our decision, Charter section A8.590-5(g)(3) (hereafter section A8.590-5(g)(3)) exempts from such binding arbitration "any rule, policy, procedure, order or practice . . . which is necessary to ensure compliance with federal, state or local anti-discrimination laws, ordinances or regulations." That section further provides that "[i]n the event the City acts on a matter it has determined relates to or pertains to a consent decree, or in the event the City acts to ensure compliance with federal, state, or local anti-discrimination laws, ordinances or regulations, and the affected employee organization disputes said determination, that determination or action shall not be subject to arbitration." (*Ibid.*)

A. *History of Litigation over Fire Department's Hiring and Promotion Practices*

The San Francisco Fire Department hired no African-American firefighters before 1955. (*U.S. v. City and County of San Francisco* (N.D.Cal. 1987) 656 F.Supp. 276, 278 (*Davis I*).) In 1970, only four of 1,800 uniformed fire personnel were African-American. (*Id.* at pp. 278–279.) The department allowed no women to apply before 1976 and hired no women until August 1987. (*U.S. v. City and County of San Francisco* (N.D.Cal. 1988) 696 F.Supp. 1287, 1289 (*Davis II*).)

Between 1970 and 1973, a federal district court ruled that three successive versions of the firefighter entry-level examination had an adverse impact on minority applicants and had not been professionally validated as an accurate measure of the knowledge, skills and ability needed for the job. (*Davis I, supra,* 656 F.Supp. at p. 279.) The court ordered affirmative action, requiring the City to hire one minority for each nonminority hired from the entry-level eligibility list until all minority applicants on the list had been hired. (*Davis I,*

at p. 280.) More than 55 percent of the minorities who had been hired by the department as of November 1987 had been hired pursuant to this court-ordered arrangement. (*Ibid.*) A consent decree terminated the action in 1977 and set a goal of 40 percent representation of minorities on the list of eligibles for entry-level positions, but did not require strict ratio or quota hiring. (*Ibid.*) That consent decree expired in 1982. (*Ibid.*)

The California Fair Employment and Housing Commission found that a 1978 firefighter promotional examination had an adverse impact on minorities and that the City failed to show that the test was sufficiently job related to be valid. (*Davis II, supra,* 696 F.Supp. at p. 1294.) Those findings were upheld on appeal. (*Ibid.*; *City and County of San Francisco v. Fair Employment & Housing Com.* (1987) 191 Cal.App.3d 976 [236 Cal.Rptr. 716].)

In 1987 and 1988, the federal district court found that entry-level and promotional firefighter examinations used between 1982 and 1984 had adverse impacts on minorities and women. (*Davis I, supra,* 656 F.Supp. at p. 281; *Davis II,* 696 F.Supp. at p. 1296.) The City did not attempt to defend the validity of the tests. (*Davis I,* at p. 281.) The *Davis I* court issued a permanent injunction requiring the development of new examinations that satisfied Title VII requirements (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.) and also established an interim hiring procedure. (*Davis I,* at pp. 289–293.) The fire department was allowed to hire from the existing eligibility lists, but had to "minimally assure that those offered positions reflect the minority and female proportions of the applicant pool," if feasible. (*Id.* at p. 292.)

In June 1988, the *Davis II* court approved a consent decree that set long-term hiring goals of 40 percent minority and 10 percent female representation in the department. (*Davis II, supra,* 696 F.Supp. at p. 1299.) The goal for promotions was to reflect the minority representation in the applicant pool. (*Ibid.*) These goals were targets and not quotas; nevertheless, failure to meet a goal had to be justified to the court. (*Ibid.*) The consent decree had a term of seven years. (*Id.* at p. 1300; see also *id.* at pp. 1311–1322.)

In 1991, the district court approved the use of "banding" to help the City meet the hiring and promotion goals in the consent decree. (*U.S. v. City and County of San Francisco* (9th Cir. 1992) 979 F.2d 169, 170 (*Davis III*).) Candidates with scores within a designated band or group of scores were considered equally qualified with respect to the skills and abilities measured by the examination. Promotions were then made from among the candidates with scores in the band on the basis of secondary criteria, including race. (*Ibid.*) The banding method the court approved was a form of statistically valid grouping. (*Ibid.*, citing *Officers for Justice v. Civil Serv. Com'n.* (9th Cir. 1992) 979 F.2d 721, 722–724.)

In December 1997, the district court terminated the consent decree on the stipulation of the parties. (*U.S. v. City and County of San Francisco* (N.D.Cal. Dec. 1, 1997, C-84-7089 MHP) 1997 WL 776533 (*Davis IV*).) The stipulated order reaffirmed the hiring and promotional goals in the consent decree and required the City to use its best efforts within the law to attain a workforce that reflected the percentages of minorities in the city population. (*Id.* at pp. *1–2.) The City agreed to develop and implement a cadet program to replace the entry-level selection process and an officer candidate program to replace the promotional process. (*Id.* at p. *3.) Prior to implementation of the officer candidate program, the City would continue to use banding for promotions to the extent necessary to meet the promotional goals and avoid an adverse impact against women and minorities. (*Id.* at p. *4.)

The stipulated order expired in 1998. (*Davis IV, supra,* 1997 WL 776533 at p. *7.) The parties then entered into a one-year memorandum of understanding that reaffirmed the goal of attaining a workforce that reflected the diversity of the population of the City and required the City to develop an outreach program, a bilingual proficiency test, and the Officer Candidate Program. The officer candidate program was never implemented, and the fire department has not held promotional examinations since termination of the consent decree in 1998.

As of June 1, 2003, the uniformed force of the fire department was approximately 57.7 percent Caucasian, 9.6 percent African-American, 13.9 percent Hispanic, 18.4 percent Asian/Pacific Islander/Filipino and 12.8 percent women.

B. *Past and Proposed Rules Regarding Promotion*

Typically, applicants for city employment take a civil service examination and are ranked in order of their scores on an eligibility list for new hires or promotions. Certification rules determine which names from the list of eligibles are certified as candidates for an open position. The appointing officer must choose from among these certified candidates to fill the position.

As of April 2000, the "Rule of Three Scores" governed promotions in the fire department. (S.F. Civ. Service Com. Rules,[1] rule 313 [issued Apr. 28, 2000].) Under that rule, all employees with the three highest scores on the list were certified as candidates when one position was available. (Rules 313.2.1(1), 313.3.1.) Because of tie scores, this group might include many more than three employees. For every additional available position, employees with the next highest score would be added to the list of certified

---

[1] All rules cited in this opinion refer to the Commission's rules unless otherwise indicated.

candidates, so that when two positions were open, the list included all employees with the top four scores; when three positions were open, it included all employees with the top five scores, and so on. (Rules 313.2.1(2), 313.3.2.) Appointing officers were responsible for establishing selection criteria for choosing among the certified candidates. (Rule 313.4.) Selection had to be "based on merit and fitness without regard to relationship, race, religion, sex, national origin . . . or other non-merit factors . . . and with due consideration of Equal Employment Opportunity goals." (Rule 313.4.)

In December 2000, the Commission notified San Francisco Fire Fighters Local 798, International Association of Fire Fighters, AFL-CIO (Union) that it intended to amend rule 313, and three related rules, rules 310–312. It offered to meet and confer about the proposed changes. The parties quickly agreed on amendments to rules 310–312, but negotiated for two years about rule 313 without reaching agreement. Negotiations focused on the banding method to be used to certify promotional candidates. The Union favored methods that resulted in a narrow band, thus limiting the discretion of appointing officers, and the Commission favored a banding method, "Statistically Valid Grouping," explained *post*, that would lead to wider bands and greater discretion. During this period of negotiations, the Commission held two public hearings at which it heard conflicting expert testimony on the use of Statistically Valid Grouping. It also heard public comment from and held informational meetings with other interested parties, including the San Francisco Black Firefighters Association.

The Commission declared an impasse in December 2002. The Commission's final position was that rule 313 had to employ Statistically Valid Grouping for certification of promotional candidates. The Union's final offer was a multi-pronged proposal to use a "Rule of Five Scores" for certification of promotional candidates, implement an officer candidate program, specify service requirements for promotions and lines of promotion, and identify secondary selection criteria, among other modifications to existing procedures.

■ After declaring the impasse, the Commission amended rule 313, consistent with its last offer to the Union. (Rule 313 [issued Feb. 21, 2003].) Rule 313 as revised requires that Statistically Valid Grouping be used exclusively for certification of candidates for promotion. (Rules 313.3.4, 313.6.) The revised rule continues the requirement that appointing officers establish nondiscriminatory selection procedures, but now requires that the criteria be announced and approved by the Commission in advance of any job announcement. (Rule 313.2.1.) The revised rule deletes any reference to equal employment opportunity goals. (Rule 313.2.1.)

Before approving the revisions to rule 313, the Commission adopted a seven-page statement of legislative findings in support of its unilateral implementation of the rule. The Commission found that the amendments were "necessary to and will ensure compliance with federal, state and local anti-discrimination laws, ordinances or regulations."

## C. *Judicial Proceedings*

In response to the Commission's declaration of impasse, the Union demanded binding arbitration pursuant to Charter section A8.590-5. The Commission refused to submit the issue to arbitration, arguing the exemption in section A8.590-5(g)(3) applied. The Union filed a petition for a writ of mandate to compel arbitration, naming the City and the Commission as respondents. The trial court denied the petition, ruling that the Commission's amendment of rule 313 was a discretionary, quasi-legislative act and thus was subject to review for abuse of discretion and that there was no abuse of discretion in the City's determination that adoption of revised rule 313 was necessary to ensure compliance with antidiscrimination law. The court concluded that banding is a "court-approved selection device" that is "a universal and normally an unquestioned method of simplifying scoring by eliminating meaningless gradations." The court also concluded that the City was not required to demonstrate the need to "employ extraordinary measures to remedy a history of past discrimination" but was acting pursuant to Title VII's requirement for investigating methods of hiring and promotion that have the least disparate impact on minorities.

The Court of Appeal reversed. It concluded that "when a municipal agency makes a finding of fact that triggers an expansion of its powers, that finding is subject to independent judicial review," and further concluded that the City's finding in the present case was subject to such review. The Court of Appeal also interpreted the word "necessary" in the clause "necessary to ensure compliance with . . . anti-discrimination laws," contained in section A8.590-5(g)(3), strictly "to mean the only available means to ensure compliance with antidiscrimination laws." The Court of Appeal determined that the City's findings and the evidence in the record did not support the conclusion that the unilateral amendment of revised rule 313 was necessary in that strict sense. It therefore reversed the trial court's judgment and remanded the matter to the trial court with directions to issue a writ of mandate requiring the City and the Commission to submit the firefighter promotional certification rule to binding arbitration. We granted review.

## II. DISCUSSION

### A. *Standard of Review*

Because a good deal of the Court of Appeal opinion below, and the briefing before this court, is devoted to a discussion of the appropriate standard of review, something more than the usual cursory recitation of the proper standard is in order.

■ "[A] standard of review prescribes the degree of deference given by the reviewing court to the actions or decisions under review." (1 Childress & Davis, Federal Standards of Review (3d ed. 1999) § 1.01, p. 1-2.) The deferential standard of review generally accorded legislative and quasi-legislative actions, at issue here, has both a constitutional and an institutional basis. "The courts exercise limited review of legislative acts by administrative bodies out of deference to the separation of powers between the Legislature and the judiciary, to the legislative delegation of administrative authority to the agency, and to the presumed expertise of the agency within its scope of authority." (*California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 211–212 [157 Cal.Rptr. 840, 599 P.2d 31].)

These principles of separation of powers and deference to administrative expertise apply not only to actions of the state but also to local legislation and to quasi-legislative administrative rules issued by local agencies. (See *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29]; *City and County of San Francisco v. Cooper* (1975) 13 Cal.3d 898 915, fn. 7 [120 Cal.Rptr. 707, 534 P.2d 403].) They apply in particular to the powers of municipal civil service commissions. As was stated in *Almassy v. L.A. County Civil Service Com.* (1949) 34 Cal.2d 387, 396 [210 P.2d 503]: Where "the civil service commission has been given broad discretionary powers in determining the subjects of examination and the qualifications which are to be measured . . . [citations], [j]udicial interference under such circumstances is unjustified except on a showing of arbitrary, fraudulent, or capricious conduct, or a clear abuse of discretion." The Charter invests the Commission with such broad discretionary powers. (Charter, §§ 10.101–10.102; see *Harris v. Civil Service Com.* (1998) 65 Cal.App.4th 1356, 1362–1363 [77 Cal.Rptr.2d 366].)

■ Nonetheless, the level of deference accorded a decision will depend in part on the nature of the challenge to the agency action. " '[A]s to quasi-legislative acts of administrative agencies, "judicial review is limited to an examination of the proceedings before the officer to determine whether his action has been arbitrary, capricious, or entirely lacking in evidentiary support, or whether he has failed to follow the procedure and give the notices

required by law." ' [Citation.] When, however, a regulation is challenged as inconsistent with the terms or intent of the authorizing statute, the standard of review is different, because the courts are the ultimate arbiters of the construction of a statute. . . . '[W]hile the construction of a statute by officials charged with its administration . . . is entitled to great weight, nevertheless, "[w]hatever the force of administrative construction . . . final responsibility for the interpretation of the law rests with the courts." [Citation.] Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations.' [Citations.] Although in determining whether the regulations are reasonably necessary to effectuate the statutory purpose we will not intervene in the absence of an arbitrary or capricious decision, 'we need not make such a determination if the regulations transgress statutory power.' " (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 11–12 [270 Cal.Rptr. 796, 793 P.2d 2], fn. omitted.)

Notwithstanding these general principles, the Court of Appeal in the present case adopted a general rule, with which the Union agrees, that "when a municipal agency makes a finding of fact that triggers an expansion of its powers, that finding is subject to independent judicial review. When the official or agency simply exercises its discretion within the ordinary scope of its powers, its decisions are reviewed for abuse of discretion." We conclude that this rule is not a correct statement of the law.

The Court of Appeal stated that "California courts have independently reviewed declarations of necessity or emergency by municipal authorities that expanded the ordinary scope of their powers." The court relied on a line of cases beginning with *San Christina etc. Co. v. San Francisco* (1914) 167 Cal. 762 [141 P. 384] (*San Christina*). In that case, San Francisco officials invoked a provision of the Charter, passed in the wake of the 1906 earthquake, that would allow it to levy taxes in excess of the maximum rate set in the Charter if a declaration of "great necessity or emergency" was issued by the board of supervisors. (*Id.* at p. 768.) The issue before the *San Christina* court, after the trial court sustained a demurrer in favor of the city, was whether the board's declaration was subject to judicial review. *San Christina* answered in the affirmative. "[W]hen the power or jurisdiction of [a municipal body] is made to depend upon the existence of a fact, its determination of the fact is not conclusive unless declared to be so [in the pertinent charter or ordinance] in express terms or by necessary implication." (*San Christina, supra*, 167 Cal. at pp. 769–770.)

Subsequent cases cited by the Court of Appeal and the Union overturned the City's attempt to increase levies based on a declaration of emergency pursuant to the same Charter provision at issue in *San Christina*, finding the

declaration without factual basis. (See *Josselyn v. San Francisco* (1914) 168 Cal. 436, 441 [143 P. 705]; *Burr v. San Francisco* (1921) 186 Cal. 508, 513 [199 P. 1034]; *Spreckels v. San Francisco* (1926) 76 Cal.App. 267, 273 [244 P. 919].) In later cases involving the exercise of emergency powers by the City's mayor, courts have found the exercise legitimate after scrutinizing the record. (*Mullins v. Henderson* (1946) 75 Cal.App.2d 117 [170 P.2d 118]; *Verreos v. City and County of San Francisco* (1976) 63 Cal.App.3d 86 [133 Cal.Rptr. 649] (*Verreos*).) In the latter case, the court, although ultimately approving the mayor's invocation of an emergency, rejected the notion that "an emergency proclamation, in order to be nullified, must be fraudulent or palpably unreasonable or arbitrary. What the cases do establish is that the trial court must determine for itself, based upon the evidence presented, whether an actual emergency existed at the time of the declaration." (*Verreos, supra*, 63 Cal.App.3d at p. 104.) More recent Court of Appeal cases, however, have reviewed municipal declarations of emergency or urgency under an abuse of discretion standard. (See, e.g., *Sonoma County Organization etc. Employees v. County of Sonoma* (1991) 1 Cal.App.4th 267, 274 [1 Cal.Rptr.2d 850]; *Crown Motors v. City of Redding* (1991) 232 Cal.App.3d 173, 179 [283 Cal.Rptr. 356]; *Northgate Partnership v. City of Sacramento* (1984) 155 Cal.App.3d 65, 69 [202 Cal.Rptr. 15].)

Whatever may be the proper standard of reviewing the validity of a municipal declaration of emergency in a given case, no such declaration is before us in the present case. Rather, at issue is a determination of whether certain actions are necessary to accomplish a well established legislative goal. We see no basis for a per se rule that would accord heightened scrutiny of this common legislative determination. In fact, in the very case relied upon by the Union, *Verreos*, the court was deferential in its review of precisely this kind of determination: "[S]ection 3.100 of the charter provided that in case of a public emergency, the mayor shall have the power and it shall be his duty to do 'whatever . . . he may deem *necessary* for the purpose of meeting the emergency.' Thus, it is apparent that this language grants extremely broad powers and discretion to the mayor in a situation where an emergency exists." (*Verreos, supra*, 63 Cal.App.3d at p. 108, italics added.)

■ We do not suggest that a deferential standard is to be invariably or uniformly applied in determination-of-necessity cases. As implied by the above passage, the discretion granted an agency by the legislation authorizing its duties, and hence the appropriate standard of review, may vary depending on the language and intent of that legislation. In the present case, section A8.590-5(g)(3) of the Charter excepts from binding arbitration "any rule, policy, procedure, order or practice . . . which is necessary to ensure compliance with federal, state or local anti-discrimination laws, ordinances or regulations." If it can be discerned that the Charter gives the City very little discretion to determine what is necessary to ensure

compliance, then some kind of more rigorous independent review would be required in order to prevent the City from circumventing what was intended to be a strict limitation on its authority. In other words, the Charter provision may define the scope of the City's discretion, and this in turn shapes not only *what* is to be reviewed but *how* it should be reviewed: legislation with a narrow definition of necessity would not be served by a deferential standard of review. But if it can be inferred from the authorizing legislation that a municipality has been granted considerable discretion to determine what is necessary to accomplish a valid legislative goal, a more deferential standard of review is appropriate. (See *Verreos, supra,* 63 Cal.App.3d at p. 108.)

We therefore agree with the Court of Appeal to the extent it concluded that the appropriate standard of review is to be derived in part from examining the Charter provision authorizing the City's and Commission's powers. But we do not agree with the Court of Appeal's general rule that "when a municipal agency makes a finding of fact that triggers an expansion of its powers, that finding is subject to independent judicial review," as opposed to when it acts "within the ordinary scope of its powers," which is subject to "abuse of discretion" review. The rule ignores the possibility that the making of the above findings may itself involve the exercise of considerable discretion that requires a deferential standard of judicial review. We therefore turn to our interpretation of the relevant Charter provision to discern whether it explicitly or implicitly sets forth the kind of deference that should be accorded to the City's actions in the present case. If the provision sheds no light on the matter, then we will employ the general principles of review of quasi-legislative actions discussed above.

### B. *The Meaning of Section A8.590-5(g)(3)*

As discussed, Charter section A8.590-4 declares that the Commission cannot unilaterally change any "term or condition of employment" and if, after meeting and conferring with union representatives, the parties bargain to impasse, the matter must be submitted to binding arbitration. The Charter thus provides a rule of impasse resolution that differs from that generally provided to local government employees through the Meyers-Milias-Brown Act. (Gov. Code, § 3500 et seq.) This latter statutory scheme permits a local agency to unilaterally impose changes in the terms and conditions of employment if the agency has met and conferred in good faith with representatives of a recognized employee organization and bargained to impasse. (See Gov. Code, § 3505; *Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 537 [28 Cal.Rptr.2d 617, 869 P.2d 1142].)

The Charter sets forth certain exceptions to this rule of binding arbitration. Section A8.590-5(g)(3), at issue here, provides in full that the above impasse

resolution procedure shall not apply to "any rule, policy, procedure, order or practice which relates or pertains to the purpose, goals or requirements of a consent decree, or which is necessary to ensure compliance with federal, state or local anti-discrimination laws, ordinances or regulations. [¶] In the event the City acts on a matter it has determined relates to or pertains to a consent decree, or in the event the City acts to ensure compliance with federal, state, or local anti-discrimination laws, ordinances or regulations, and the affected employee organization disputes said determination, that determination or action shall not be subject to arbitration."

The main controversy in interpreting this provision is construing the meaning of "necessary." The Court of Appeal agreed with the Union that the word should be interpreted in a strict sense. As the court stated: "The primary definition of 'necessary' in the Oxford English Dictionary is 'indispensable, requisite, essential, needful; that cannot be done without' (11 Oxford English Dict. (2d ed. 1989) pp. 275–276), and the definition in Webster's 10th New Collegiate Dictionary (2000) page 774 is 'absolutely needed[,] required.' The plain meaning of words used in a charter is our primary guide in interpreting the Charter. [Citations.] As used in section A8.590-5(g)(3) of the Charter, we construe 'necessary' to mean *the only available means to ensure compliance with antidiscrimination laws.*" (Italics added.)

The City points to a long line of cases holding that the term "necessary" does not necessarily have the above meaning. "In the law, the word 'necessary' has not a fixed meaning, but is flexible and relative. . . . [Citation.] [It] must be considered in the connection in which it is used, as it is a word susceptible of various meanings. It may import absolute physical necessity or inevitability or it may import that which is only convenient, useful, appropriate, suitable, proper or conducive to the end sought." (*Westphal v. Westphal* (1932) 122 Cal.App. 379, 382 [10 P.2d 119]; accord, *People v. Belous* (1969) 71 Cal.2d 954, 961 [80 Cal.Rptr. 354, 458 P.2d 194]; see also *Zack v. Marin Emergency Radio Authority* (2004) 118 Cal.App.4th 617, 633 [13 Cal.Rptr.3d 323] (*Zack*) ["for purposes of determining whether a power is implied, the word 'necessary' has been judicially defined in California as meaning convenient, useful, appropriate or suitable, *and not indispensable.*"]; *Grissom v. Vons Companies, Inc.* (1991) 1 Cal.App.4th 52, 58 [1 Cal.Rptr.2d 808] ["the word 'necessary' is 'susceptible of various meanings' depending on the context in which it is used"]; *Danley v. Merced Irr. Dist.* (1924) 66 Cal.App. 97, 105 [226 P. 847] (*Danley*).)[2]

---

[2] The Union contends that the definition of "necessary" in *Zack* and in *Danley* is "specific to the context of those cases." Accordingly, the Union acknowledges that the word "necessary" has a varying, context-specific meaning, and indeed conceded the point at oral argument.

We will therefore examine the word "necessary" within the context of the rest of the Charter provision to determine which of its various meanings was intended. We find critical to this interpretation the second paragraph of section A8.590.5(g)(3), which states: "In the event the City acts on a matter it has determined relates to or pertains to a consent decree, or *in the event the City acts to ensure compliance* with federal, state, or local anti-discrimination laws, ordinances or regulations, and the affected employee organization disputes said determination, *that determination or action shall not be subject to arbitration.*" (Italics added.)

How can the first paragraph of section A8.590-5(g)(3), providing that only a rule, etc. that is "necessary to ensure compliance" with antidiscrimination laws is to be exempt from binding arbitration, be reconciled with the second paragraph, that whenever the City acts "to ensure compliance with" antidiscrimination laws, the action is exempt from binding arbitration? We believe the two paragraphs cannot be reconciled *if* one adopts the Court of Appeal's and the Union's strict definition of "necessary": just because the City is taking an action to ensure compliance with antidiscrimination laws does not mean that it is employing the *only available means* toward such compliance, and therefore the two paragraphs would have conflicting standards as to when a City action is exempt from binding arbitration.

■ But the second paragraph can be harmonized with the first, if "necessary" is construed in its broader sense, i.e., "that which is . . . convenient, useful, appropriate, suitable, proper or conducive" (*Westphal v. Westphal, supra,* 122 Cal.App. at p. 382) to ensuring compliance with antidiscrimination laws. In other words, a rule, policy, procedure, order or practice, that is necessary, i.e., convenient, useful, appropriate, suitable, proper or conducive to ensure compliance with antidiscrimination laws is not subject to binding arbitration; therefore when the City takes an action to ensure compliance, such as adopting, amending, or implementing a rule, etc., that is convenient, useful, appropriate, suitable, proper or conducive to ensure compliance with antidiscrimination laws, that action is itself "necessary" to ensure compliance in the broad sense of the word, and therefore exempt from binding arbitration. Hence, that broader definition of "necessary" is the one consistent with the language of section A8.590-5(g)(3), read in its totality.

The Court of Appeal did not cite nor discuss the second paragraph of the Charter provision. The Union offers its own meaning of the second paragraph as follows: "[The Union] agrees that a determination that an action is necessary to ensure compliance with anti-discrimination laws is not subject to *arbitration.* However, [the Union] is not seeking to arbitrate that determination. [The Union] is seeking *judicial review* of that determination. It is the underlying issue of the proper certification rule, not the determination of

necessity, that is subject to arbitration. Neither section A8.590-5(g) nor any other section of the Charter precludes judicial review of the necessity determination. In order to ensure that the City does not exceed its powers, the City's determination of necessity must be subject to judicial review."

The Union's view appears to come down to this: a rule, etc., that is necessary to ensure compliance with antidiscrimination laws is exempt from binding arbitration. When the City acts to ensure compliance with antidiscrimination laws, then a court, rather than an arbitrator, is supposed to determine whether the act is necessary to ensure compliance. "Necessary to ensure compliance" means for the Union, as for the Court of Appeal, "the only available means to ensure compliance with antidiscrimination laws." In other words, "necessary to ensure compliance" and "acts to ensure compliance" refer to two different things—the former is the standard for determining when a City rule, etc., is exempt from binding arbitration, the latter is an action that triggers judicial review of whether the rule, etc., meets the necessary to ensure compliance standard.

We do not believe this interpretation is plausible. In order for it to be viable, the phrase *"that determination or action* shall not be subject to [binding] arbitration" at the end of the second paragraph of section A8.590.5(g)(3) (italics added) would have to refer back to the determination in the first paragraph, i.e., a determination of necessity. But "that determination or action" clearly refers back to the beginning of the second paragraph. What is not subject to arbitration, inter alia, is an "action" "to ensure compliance with anti-discrimination laws." Because "action" refers back to "acts to ensure compliance" with antidiscrimination laws, section A8.590-5(g)(3) makes it clear that once the City acts to comply with antidiscrimination laws, that action itself is not subject to binding arbitration, not merely the "determination" that the act is "necessary to ensure compliance." The more reasonable interpretation, as explained *ante*, is that the second paragraph's provision exempting the City from binding arbitration any time it "acts to ensure compliance" with antidiscrimination laws demonstrates a mandate of broad discretion to the City, and that the word "necessary" in the first paragraph must be understood in the broader sense so that its meaning is consistent with that mandate.

Other language in the Charter provision also leads to the conclusion that the word "necessary" is to be interpreted broadly to give the City considerable discretion. Section A8.590-5(g)(3) speaks in terms of ensuring compliance with "federal, state, or *local* anti-discrimination laws, ordinances or regulations." (Italics added.) Thus, exempted from the binding arbitration provisions are not only actions taken to comply with federal or state law, but also actions taken to comply with antidiscrimination laws passed by the City

itself, and not only City ordinances, but also municipal antidiscrimination "regulations." This provision is inconsistent with an interpretation of section A8.590-5(g)(3) that would narrowly circumscribe the City's authority to act unilaterally to address unlawful discrimination.

Finally, the kind of determination the City must make in order to ensure compliance with antidiscrimination laws does not fit well with a strict showing of necessity. What does the Court of Appeal's definition of "necessary"—"the only available means to ensure compliance with antidiscrimination laws"—mean in the present context? The Commission's determination that an action is necessary to comply with antidiscrimination laws is not a finding of fact in the strict sense, but a prediction that a certain employment action—in the present case the modification of the way promotional exams are used to evaluate applicants—will survive litigation brought under antidiscrimination laws. Suppose the City reasonably determined that the strategy it adopted had a good chance of withstanding a legal challenge, and that the alternative adopted by the Union was less promising in this regard, but still had some chance of surviving such a challenge. Is the City's action the "only available means to ensure compliance with antidiscrimination laws?" The answer may be "no," but that negative answer only serves to underscore the inaptness of the inquiry. Because the decision about the best way to comply with antidiscrimination laws is a complex prediction rather than a simple factual determination, it is a judgment call that inherently involves the exercise of discretion. (See *Sonoma County Organization etc. Employees v. County of Sonoma, supra,* 1 Cal.App.4th p. 279.) The electorate that adopted this Charter provision evidently chose to lodge that discretion with the City itself, which has the ultimate legal obligation to comply with such laws and considerable potential liability if that obligation is not fulfilled.

That is not to say that section A8.590-5(g)(3) does not contemplate judicial review. Section A8.590-5 establishes, as a general rule, that matters negotiated to impasse are to be submitted to binding arbitration, with the exception of City actions "to ensure compliance with . . . anti-discrimination laws." (§ A8.590-5(g)(3).) A court must therefore review the action to determine whether it is in fact taken "to ensure compliance with . . . anti-discrimination laws." (*Ibid.*) It would violate both the letter and spirit of the Charter provision if the City were permitted to evade the binding arbitration requirement with an action that is unrelated, or only remotely related, to compliance with antidiscrimination laws. Section A8.590-5(g)(3) requires that the measure adopted be "necessary" to the goal of ensuring compliance with antidiscrimination laws, which, as discussed, means in context that the action be "convenient, useful, appropriate, suitable, proper or conducive" to the goal of a ensuring such compliance. (*Westphal v. Westphal, supra,* 122 Cal.App. at p. 382.) Or, to use a more concise modern formulation, the action must be reasonably related to that goal. (See, e.g., *Birkenfeld v.*

*City of Berkeley* (1976) 17 Cal.3d 129, 159 [130 Cal.Rptr. 465, 550 P.2d 1001] [exercise of local government police power will be upheld when "the measure reasonably relates to a legitimate governmental purpose"].) But when there is a reasonable relationship, section A8.590-5(g)(3) withdraws the action from binding arbitration even if there is a bona fide dispute between the City and the Union about the City's determination that the action is the appropriate means of ensuring compliance with antidiscrimination laws.

### C. *Application to Present Case*

We must determine whether the adoption of rule 313 is reasonably related to ensuring the City's compliance with antidiscrimination laws and not merely a means of circumventing the Charter's binding arbitration requirements. In order to make this determination, we must first review the antidiscrimination laws in question. Both parties agree that the laws bearing most directly on the City's promotional exams for firefighters are Title VII and article I, section 31 of the California Constitution, incorporating Proposition 209.

■■■ Under Title VII, " '[d]iscriminatory [employment] tests are impermissible unless shown, by professionally acceptable methods, to be predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.' [Citation.] In evaluating employment tests that are alleged to have a racially disparate impact, [courts] first consider whether the plaintiff has established a prima facie case by demonstrating that the test causes a disparate impact on the basis of race." (*Assoc. of Mexican-American Educators v. State of California* (9th Cir. 2000) 231 F.3d 572, 584 (*Mexican-American Educators*).)

If the plaintiff makes a prima facie case, "the burden shifts to [d]efendants to demonstrate that the [test] was validated properly." (*Mexican-American Educators, supra,* 231 F.3d at p. 584.) To demonstrate that a test was validated properly, the defendants "are required to 'show that it has "a manifest relationship to the employment in question." ' [Citation.]" (*Id.* at p. 585.) If the defendant carries its burden, a plaintiff "may still prevail under a Title VII claim if he or she can show that other tests or selection devices would also serve the employer's legitimate hiring interests and at the same time have a lesser adverse impact upon that protected class." (*Brunet v. City of Columbus* (6th Cir. 1993) 1 F.3d 390, 410; see *Mexican-American Educators, supra,* 231 F.3d at p. 584, fn. 7.)

■■■ California Constitution, article I, section 31, subdivision (a) states: "The State shall not discriminate against, or grant preferential treatment to,

any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." "[I]n approving Proposition 209, the voters intended section 31, like the Civil Rights Act as originally construed, 'to achieve equality of [public employment, education, and contracting] opportunities' [citation] and to remove 'barriers [that] operate invidiously to discriminate on the basis of racial or other impermissible classification.' " (*Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 561–562 [101 Cal.Rptr.2d 653, 12 P.3d 1068].)

As an initial matter, it seems inarguable that discriminatory promotional exams are traditional subjects of Title VII litigation (see *Connecticut v. Teal* (1982) 457 U.S. 440, 448 [73 L.Ed.2d 130, 102 S.Ct. 2525]), and that action regarding such exams at least plausibly *could* be actions to ensure compliance with antidiscrimination laws. We agree with amicus curiae San Jose Police Officers Association that section A8.590-5(g)(3) should not be interpreted so broadly that every action regarding the terms and conditions of employment that has a remote or indirect effect on minorities would fall within its scope, thereby making it the exception that swallows the binding arbitration rule. But in the present case, a rule that purports to reduce the discriminatory impact of a promotional exam would have a direct effect on the City's capacity to withstand a Title VII challenge.

Furthermore, the San Francisco Fire Department has had a long history of litigation concerning promotional exams. (See *Davis I, supra,* 656 F.Supp. at p. 281; *Davis II,* 696 F.Supp. at p. 1296.) As recounted, that litigation resulted in a 10-year-long consent decree, in which the court supervised hiring and promotional tests to foster a more diversified workforce. The Union argues that there is no viable Title VII issue before the City because, as the result of the consent decree, the fire department has achieved a diversified workforce and there are no pending Title VII challenges. However, since the dissolution of the consent decree, the fire department has had no promotional exams, and therefore there has been nothing to challenge.

More importantly, nothing in section A8.590-5(g)(3) limits the City's actions to ensure compliance with antidiscrimination laws to those actions responding to pending or impending legal challenges. Obviously, the City may anticipate such legal challenges and design programs more likely to comply with the law and withstand such challenges. Indeed, Title VII requires public agencies to be proactive in adopting employment selection procedures. " '[B]efore utilizing a [selection] procedure that has an adverse impact on minorities, the City has an *obligation* . . . to explore alternative procedures and to implement them if they have less adverse impact and are substantially equally valid to rank ordering.' " (*Brunet v. City of Columbus, supra,* 1 F.3d at

p. 412.) The City reasonably determined that it should act prospectively in devising a valid method of promotion that would minimize adverse impacts on minorities.

We turn then to examine the rule adopted by the City. The controversy between the fire department and the City specifically revolves around the amendment of rule 313 with rule 313.3.4, "Statistically Valid Grouping (Sliding Band)," which is the only method to be used for selecting promotional candidates. As we will explain, this selection method is designed to lessen reliance on promotional exams, which have a history of having a discriminatory impact, and increase reliance upon other measures of ability.

 Statistically Valid Grouping, as adopted by the Commission, has three distinctive features. First, it is a specific method of banding scores, i.e., treating a range of different scores as substantially similar, so that everyone scoring within the range is considered "to be of comparable knowledge, skills and abilities with respect to the areas tested on the examination." (Rule 313.3.4(2).) The standard error of the difference is used to determine the width of the band, and therefore the banding method is sometimes referred to as SED banding. As one expert consultant to the Commission, Dr. James Outz, stated, the standard error of the difference is related to the standard error of measurement. The standard error of measurement measures how much an individual score on a given exam will vary due to random factors. (See *Guardians Ass'n of New York City v. Civil Serv.* (2d Cir. 1980) 630 F.2d 79, 102–103 (*Guardians Association*).) The standard error of the difference is a means of determining whether the difference between two scores is a true difference and not due to chance alone. (See Mehrens & Lehmann, Measurement and Evaluation in Education and Psychology (1st ed. 1973) p. 119.) The number generated by the standard error of the difference is then multiplied by a numeric value that represents the confidence level, i.e., the degree of confidence in the result. A confidence level of 1.96, which Dr. Outz recommended and the Commission adopted, means that the difference between two scores is large enough so that there is a 95 percent confidence that the difference in scores is a true difference not to be attributed only to random factors.[3] That range of scores then becomes the band within which the

---

[3] The 1.96 figure refers to the standard deviation of the exam scores. The standard deviation is a measure of the extent to which data cluster around a mean. (Sax et al., Principles of Educational and Psychological Measurements and Evaluation (4th ed. 1997) p. 191.) In terms of exam scores, "standard deviation" and "mean" are the descriptive attributes of a probability distribution, which predicts the chances that person x (about whom one has no information) will obtain a certain score on a certain test. In a normal distribution, a standard deviation encompasses plus or minus 34 percent of the scores, or 68 percent total, and two standard deviations are plus or minus 48 percent, or 96 percent of the total. (*Id.* at p. 200.) Hence, 1.96 standard deviations encompass 95 percent of the total.

promotion applicants are considered to have scored comparably, also termed the "grouping." (Rule 313.3.4(1).)

The second feature of the Statistically Valid Grouping adopted by the Commission is a "sliding band" approach. The sliding band is explained in rule 313.3.4(3): "If at any time, the highest score in the grouping is exhausted, the grouping will slide so that its upper limit rests on the highest score remaining on the list. Any additional eligibles whose scores fall within the new grouping shall be certified to available positions."

The third feature of the certification rule is the use of "secondary criteria" to select those worthy of promotion from among the candidates that fit within the grouping. The secondary criteria are to be developed by the "appointing officer," "shall be job related" and "may include, but need not be limited to experience(s), training and employment history." (Rule 313.3.4(6)–(8).) The rule also states that the secondary criteria "shall not be based on race, religion, gender" or similar criteria.

This SED banding method is not without controversy. (See Campion et al., *The Controversy Over Score Banding in Personnel Selection: Answers to 10 Key Questions* (Spring 2001) 54 Personnel Psychol., p. 149.) Dr. Paul Hoffman, also speaking before the Commission, criticized the assumptions behind making the bands or grouping so broad. He disagreed that a 1.96 confidence level to ensure a 95 percent certainty that score differences are nonrandom is warranted. Dr. Hoffman argued that, while the 95 percent figure is commonly used and is appropriate in scientific experiments to establish statistical significance, where a high degree of certainty is required, it is inappropriate in the case of personnel decisions, wherein the cost of such high certainty would be a substantial number of wrong hiring and promotion decisions. For example, he pointed out that in the case of the examination contemplated for the fire department, with a reliability coefficient of .6, the Statistically Valid Grouping would require the City to determine that there is no difference between candidates who have the highest and lowest scores within a 17-point range, even though the City would be wrong a significant portion of the time. He suggested that a 50 percent confidence level would be more appropriate in the personnel context, which would lead to a substantially narrower banding.

Dr. Outz responded that a 95 percent confidence level is widely used in the scientific community and accepted by the courts as valid. (See *Guardians Association, supra,* 630 F.2d at p. 103.) Dr. Outz also argued that, given the fact that even properly validated tests measure only a limited part of future job performance, it would be a mistake to exclude people from promotion based on small to moderate differences in test performance. He further

contended that the reliability coefficient for the exam would be considerably higher than .6. He also maintained generally that both fixed and sliding banding have received judicial acceptance.[4]

Another concern raised by one of the Commissioners, and echoed by the Court of Appeal and by the Union, was that banding would have no effect on minority representation except when minority preferences are included in the secondary criteria, whereas the Commission's rule excludes such criteria. Dr. Outz testified that "the literature has not caught up to the practice," and that in his experience eliminating rank order selection and using job-related secondary criteria would produce diversity.

The Court of Appeal opined that "[b]ecause secondary criteria are undefined in revised rule 313, it would be speculation to conclude that their use will result in less adverse impact" on protected groups than test scoring. But it is reasonable for the Commission to conclude that use of Statistically Valid Grouping combined with "job-related" secondary criteria, of which experience, training and employment history are mentioned as examples, will produce a more diverse workforce than a scheme that selects promotional candidates from narrower bands and therefore places greater reliance on test scores that have been shown to have an adverse impact on minorities. Moreover, under rule 313.2.1, the Commission would have to approve any secondary criteria, and would thereby be able to ensure that those criteria would be truly job-related and nondiscriminatory.

The Union, for its part, advocated for the use of the Rule of Three Scores, and in response to the Commission staff recommendation of a "Rule of Seven Scores," offered to compromise with the Rule of Five Scores. The Union also proposed the reinstitution of an officer's candidacy program, and improving the testing program, including publishing reading lists for each examination, recruiting examination raters reflective of the city's diversity, and informing applicants of the reasons they were passed over for promotion, which would assist them in subsequent examinations.

From our review of the record, we see nothing to suggest anything other than a bona fide controversy between the City and the Union over the best way to establish a method of promotion that would comply with antidiscrimination laws. In acting as it did, the City was required to resolve the tension

---

[4] Case law has generally supported banding as a means of reducing the adverse impact of testing on minorities. As one court has stated in approving banding: "The district court heard evidence that the test scores themselves are imprecise measurements of future job performance and that by banding the scores and considering secondary criteria in making promotion decisions, the City may increase the probability that the most qualified candidates will be promoted." (*Officers for Justice v. Civil Serv. Com'n, supra,* 979 F.2d at pp. 727–728; see also *Guardians Association, supra,* 630 F.2d at pp. 100–101.)

between remedying practices that discriminate against some minorities and observing California Constitution article I, section 31's requirement that state and local laws not favor employees on the basis of sex or race. It is true, as the Court of Appeal stated below, that it is not certain whether Statistically Valid Grouping will reduce the adverse impact of examination scoring in the absence of explicit consideration of race and gender. But whether and to what degree it will have that effect is an empirical question that must be tested by experience. Given the testimony of experts appearing before the Commission that prior practice confirmed the efficacy of the selection method at issue, and given the conclusion that rank order selection by itself has had a discriminatory impact, the Commission had a reasonable basis for determining that Statistically Valid Grouping would succeed in ensuring compliance with antidiscrimination laws.

The Union argues that the City's preference for Statistically Valid Grouping has less to do with compliance with antidiscrimination laws and more with expanding the discretion of the City's management in making promotional decisions. However, because rank order testing has been demonstrated by past litigation and expert opinion to have a discriminatory impact, expansion of management discretion guided by job-related criteria appears to be a reasonable way to reduce such impact.

The debate over the size of the grouping, and the choice of the proper confidence level, are also controversies over which reasonable minds, and reasonable expert opinion, may differ. A large grouping will minimize the chance that a qualified candidate will be excluded, but will increase the chance that an unqualified candidate will be erroneously included. A small grouping will have the opposite effect, increasing the chance that a qualified candidate will be erroneously excluded. Which kind of error is to be preferred and to what extent are essentially policy decisions, and we cannot say the City's choice to minimize the chance of exclusion of qualified candidates, while reducing the chance of including unqualified candidates through the use of job-related secondary criteria, is an unreasonable means of complying with antidiscrimination laws or at odds with accepted examination and measurement practices. In sum, the Commission's adoption of the new rule 313 was reasonably related to the goal of ensuring compliance with antidiscrimination laws.

We emphasize the narrowness of our holding. We do not, of course, decide whether in fact the Commission's alternative will survive legal challenges based on antidiscrimination laws. No such challenge is before us. Nor do we decide that the Commission's selection method is superior to those proposed by the Union. All that we determine is that the Commission has acted in amending rule 313 "to ensure compliance with anti-discrimination laws,"

notwithstanding the fact that the Union disputes the means of compliance chosen. As such, section A8.590-5(g)(3) explicitly provides that binding arbitration is not the means of resolving this dispute, and implicitly permits the City to implement the new rule 313 unilaterally after bargaining in good faith to impasse. For that reason, we conclude that the Court of Appeal's determination that a writ of mandate should issue compelling binding arbitration was in error.

## III. DISPOSITION

The judgment of the Court of Appeal is reversed with directions to reinstate the trial court's judgment denying the Union's petition for a writ of mandate.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.