Filed 10/27/22  In re Juan A. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re JUAN A., a Person Coming Under the Juvenile Court Law. | D079687 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super. Ct. No. JCM244028 01) |
| v. | |
| JUAN A., | |
| Defendant and Appellant. | |
| In re GABRIEL M., a Person Coming Under the Juvenile Court Law. | D079744 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super. Ct. No. JCM244027 01) |
| v. | |
| GABRIEL M., | |
| Defendant and Appellant. | |

CONSOLIDATED APPEALS from judgments of the Superior Court of San Diego County, No. JCM244028 01, No. JCM244027 01, Kathleen M. Lewis, Judge, and Marian F. Gaston, Judge.  Affirmed as to *People v. Gabriel M.* (case no. JCM244027 01).  Affirmed in part, reversed in part, and remanded with directions as to *People v. Juan A.* (case no. JCM244028 01).

Elisabeth R. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant Juan A.

Shaghayegh Dinata-Hanson, under appointment by the Court of Appeal, for Defendant and Appellant Gabriel M.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski, Laura Baggett and Yvette Martinez, Deputy Attorneys General for Plaintiff and Respondent.

## INTRODUCTION

Patdown searches of two juveniles, Juan A. and Gabriel M., revealed each of them was carrying a concealed firearm.  Delinquency petitions were filed against Juan and Gabriel, and each of them filed a motion to suppress challenging the justification for the searches.  The juvenile court denied their motions to suppress.  Each juvenile was then adjudged a ward of the court (Welf. & Inst. Code,[1] § 602) after admitting one count of unlawful possession of a concealable firearm (Pen. Code, § 29610).

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

On appeal, Juan and Gabriel challenge the juvenile court's denial of their motions to suppress.[2] We conclude the police officers who conducted the patdown searches did not violate Juan's or Gabriel's rights under the Fourth Amendment to the United States Constitution. The court's ruling on the suppression motions was therefore not erroneous. We affirm the judgment entered against Gabriel. We reverse the dispositional order entered against Juan and remand his case so the sentencing judge can expressly declare whether his firearm offense is a felony or a misdemeanor as required by section 702. On remand, Juan may assert an alleged disposition error raised by the People in their responsive brief on appeal.

FACTUAL AND PROCEDURAL BACKGROUND

The San Diego District Attorney filed petitions under section 602 alleging that then 17-year-old Juan and 17-year-old Gabriel were each found in possession of a concealable firearm (Pen. Code, § 29610) and live ammunition (Pen. Code, § 29650). Juan and Gabriel filed separate motions to suppress evidence. (§ 700.1.) The motions were heard by Judge Kathleen M. Lewis at a combined suppression hearing. The prosecution presented testimony from the two arresting officers, Officers Arturo Morales and Gerald Perrin of the San Diego Police Department, and footage from Morales's body-worn camera.

---

[2] Juan and Gabriel filed separate appeals (*People v. Gabriel M.* (D079744) and *People v. Juan A.* (D079687)). After both appeals were fully briefed, we consolidated them on our own motion for purposes of decision, as both involve the same facts, challenge rulings made contemporaneously by the same judge, and raise similar issues. (See *In re Edgerrin J.* (2020) 57 Cal.App.5th 752, 755, fn. 1 [consolidating for decision the appeals of two juveniles whose suppression motions were denied by the same judge at the same hearing].)

I.

*Summary of Evidence Presented at the Suppression Hearing*

A.    *Officer Morales's Testimony and Body-Worn Camera Footage*

Officer Morales testified that on October 12, 2021, at approximately 4:30 p.m., he was patrolling the 6600 block of Kelly Street in San Diego with his partner, Officer Perrin.  Morales was assigned to the Special Operations Unit, which is tasked with working "high-gang areas where there is any violence, rising crime, firearm crimes, narcotics."  The Special Operations Unit receives daily or near-daily briefings from gang detectives about "crimes, shootings, homicides, robberies in the area . . . involving their gang set in particular."  Before April, when Morales was assigned to the Special Operations Unit, he had worked in southeastern San Diego, which has the "biggest gang set and the most gangs in the County of San Diego"; before that, he had worked in areas of San Diego populated with multiple different gang sets.  Morales had attended a gang class in the Police Academy, and he had also attended the Southern California Gang Conference from 2016 to 2019.  He estimated that in the course of his career as a police officer, he had either been in contact with, stopped, or conversed with over one thousand gang members.

Kelly Street is a high-crime area and "a known gang hangout."  Morales had been there before, on patrol, in pursuits, or to "recover firearms from that particular area."  The 6600 block of Kelly Street is considered a territory of the Linda Vista 13 criminal street gang, which is known to commit violent crimes within its territories, including "any type of retaliation, assault with a deadly weapon, shootings, homicides, robberies, batteries."

4

A memorial had been set up on the 6600 block of Kelly Street at the site of the May 2019 homicide of a Linda Vista 13 gang member. Multiple shootings had taken place at the memorial site since that homicide. One of the shootings happened a few weeks after the homicide; a rival gang shot Linda Vista 13 gang members who were at the site paying their respects "to their fallen gang member and friend." Morales testified the memorial site also had been the location of numerous radio calls relating to the initiation of new gang members, as well as "shootings that were reported [without injury], and also unreported shootings" that detectives relayed to patrol officers.

While driving eastbound on the 6600 block of Kelly Street, the officers noticed two "young-in-age looking juveniles," identified as Juan and Gabriel, standing by the memorial. Morales described the memorial as "a few candles on the sidewalk" that had the appearance of "a vigil." The sidewalk near the memorial "was tagged all over" with writing that said "Linda Vista 13" and "L-V 1-3." Gabriel was standing about five feet away from Juan, and was wearing a black hoodie that obscured his waistband.

The officers stopped their patrol car in the middle of the street about 25 to 30 feet away from Juan and Gabriel. From their vehicle, the officers talked to the juveniles about what they were doing on the sidewalk. Morales testified both juveniles replied at the same time that "they were sitting there paying their respects to *their* friend at the memorial." (Italics added.) Morales knew the memorial victim was the Linda Vista 13 gang member who had been killed at that location in May 2019. The juveniles were calm and "were having a conversation back" with Morales.

While Morales was sitting in his patrol car talking to the juveniles, he noticed Juan was smoking something that appeared to be a cigarette. Morales testified, "the more we hung out having a conversation[,] the more I

5

got the strong odor of marijuana."  He decided to step out of the patrol car to "contact them about the possible narcotics that they were smoking."  As Morales got ready to exit the patrol car, Juan "flicked the . . . rolled cigarette he was smoking onto the sidewalk."

Morales exited the patrol car intending "to see what the lit substance that [Juan] flicked was."  As Perrin approached Juan, Morales approached Gabriel and conducted a patdown search of Gabriel for weapons.  Morales testified:  "I was getting ready to have a conversation and I felt uneasy just knowing my background of the area, knowing how it's a known gang area, it's a big gang hangout, knowing they were at a memorial for a known gang member, and I could visually see 'Linda Vista 13,' 'LV13' tagging all over the sidewalk, and I knew [Gabriel] was wearing a big sweater.  [¶] . . . [¶]  Gang members are known to carry weapons to defend themselves.  A lot of gangs like to retaliate, . . . especially in that area where it's open, and it's happened before where they were sitting there, paying their respects, and they were attacked by rival gang members, so they're known to carry weapons to defend themselves.  So before I continued the conversation, for my safety and my partner's safety, I wanted to do a weapons pat down and make sure there was no firearms, knives, anything that could hurt us."

As Morales conducted the patdown search, he immediately felt what he believed to be the grip of a handgun in Gabriel's waistband.  Morales handcuffed Gabriel and indicated to Perrin that Gabriel was carrying a handgun by putting his right hand up above his head and pulling his finger to simulate a trigger.  Morales then walked Gabriel over to the patrol car, where he recovered a Glock-style handgun from Gabriel's waistband.  There were three rounds of ammunition in the gun's magazine.

6

Footage from Morales's body-worn camera showed some, but not all, of his interaction with Juan and Gabriel.[3] The prosecutor explained at the hearing that the first two minutes of the footage were silent. The two-minute mark coincided with the point when Morales was exiting the patrol car. Before that, the footage, in addition to being silent, showed little more than the interior of the patrol car. The footage showed that as Morales exited his patrol car, Gabriel was directly in front of him on the sidewalk. Juan was standing further away from Morales and (from Morales's perspective) to the left of Gabriel, leaning with his back against a chain-link fence that paralleled the sidewalk. Gabriel was wearing a loose-fitting black hoodie that concealed the top of his long shorts. Juan was wearing an untucked t-shirt and a jacket.

Morales walked towards Gabriel while saying, "Only reason I'm talking to you man is because [I] noticed you're smoking a little bit of bud, that's . . . alright, I'm not sweating it too much." Morales then stopped next to Gabriel and told Gabriel to turn around, telling him he was "[j]ust gonna do a quick patdown brother." Morales held Gabriel's arm briefly as he spoke to him, but then let go as Gabriel turned around. After Gabriel turned around, Gabriel placed his hands behind his back. A few seconds later, Morales handcuffed Gabriel and motioned to Perrin, with the "pulling-the-trigger" gesture, that he had found a gun on Gabriel. The entire encounter, measured from the time Morales exited the patrol car to the time he handcuffed Gabriel, lasted approximately 30 seconds.

---

[3]    A DVD containing the footage from the body-worn camera was marked as an exhibit and played during the suppression hearing. The DVD was transmitted to this court by Gabriel as part of the record on appeal, and we have reviewed the footage.

On cross-examination, Morales testified he exited his vehicle because he suspected Juan of possession of marijuana in violation of Health and Safety Code section 11357, which is an infraction, not a jailable offense. Morales did not see Gabriel smoking anything. Although Morales was aware that gang initiations, assaults, and shootings had happened at the memorial site, he did not know how many initiations, unreported shootings, or assaults there had been. The juveniles were cooperative and did not try to flee, and Gabriel did not reach into his pockets or waistband.

When Morales exited his patrol car, he did not immediately walk over to Juan. Instead, Morales conducted a patdown of Gabriel to "[make] sure that [he and Perrin] were safe before [he] continued [the] interaction." Gabriel's hands were behind his back during the patdown because Morales's practice when conducting a patdown is to have the person place their hands behind their back. Morales explained this "opens up their waistband and keeps their hands behind them so that [Morales] can reach over, feel the waistband, which is a primary area where weapons are tucked[.]"

On redirect, Morales explained that if he had walked up to Juan first, he would have had to pass by Gabriel, and his back or his right side would have been facing Gabriel. He also testified that Gabriel seemed "a little nervous" as Morales was interacting with him.

B.    *Officer Perrin's Testimony*

Officer Perrin, like Morales, was assigned to the Special Operations Unit. Perrin had been a law enforcement officer for 13 years. As a member of the Special Operations Unit, he had assisted with apprehending violent criminals who were members of the Linda Vista 13 criminal street gang. Perrin had patrolled the area near the memorial site before and had responded to crimes in that area approximately 20 times. He knew it was a

8

frequent hangout of Linda Vista 13 gang members, and that there had been a homicide at that location as well as shootings and other violent crimes.

On October 12, 2021, as the officers were patrolling the 6600 block of Kelly Street, they observed two males standing next to the memorial. The males were standing about three to five feet apart and were "staying close" to the memorial. One of the males, whom Perrin identified as Juan, had a lit substance in his hand that the officers thought might have been a cigarette or possibly marijuana.

Perrin exited the patrol car from the drivers' side. He contacted Juan as Morales exited and contacted the other male. Juan was wearing loose, baggy clothing, and "a zip-up type of sweater with shorts and a t-shirt." Perrin could see his waistband "for the most part." Perrin told Juan "why [the officers] were talking to him" and Juan did not dispute "the reason why [the officers were] talking to him." Morales then signaled to Perrin that Morales had "found a gun on the person he was contacting." Perrin thought Juan "could also have a gun, a weapon on him as well." Perrin detained Juan in handcuffs, conducted a patdown search for weapons, and found a handgun on Juan's person. The gun was loaded with seven rounds of ammunition.

On cross-examination, Perrin admitted he had not interacted with Juan before and "didn't know how he knew his friend whose memorial he was at[.]" Perrin did not conduct the patdown search of Juan until after Morales indicated he had located a gun on Gabriel. When Perrin told Juan to turn around, Juan complied.

## II.

### *Juvenile Court's Ruling*

In an oral ruling pronounced at the end of the suppression hearing, Judge Lewis denied the suppression motions, stating it was a "close call."

9

The court ruled the officers were conducting an investigatory stop.[4] It found the officers "thought [the juveniles] were young and they were youth and they were smoking something, and they were almost going to kind of lecture them, and . . . everything happens almost concurrently." The court stated the officers "had a right to contact [the juveniles], . . . as minor as it may be."

The court further determined that under "the totality of the circumstances . . . [the officers] acted properly as far as the pat downs are concerned." The court noted the juveniles were wearing loose clothing, and Morales could not see Gabriel's waistband. It further noted that Morales "did specifically say that he did the pat down . . . because he wasn't going to turn his back or his side to . . . Gabriel, and bend down and pick up whatever had been dropped." The court found the officers knew they were in "not just a high-crime area, but . . . a high gang area. [¶] Not only a high gang area, but at the exact corner where another gang member in that Linda Vista 13 gang has been killed, where there have been other shootings. . . . [¶] They're both there where other gang members go to honor a deceased gang member and pay their respects[;] there is tagging all over the place[.]" The court stated it was "reasonable for the officers to assume based on all [the] circumstances that both of the minors were affiliates at the least or possibly members of the LV13 gang, and it was reasonable to assume based on that that one or both

---

[4] At the start of the juvenile court's ruling, the court stated, "in my view it isn't an investigatory stop." The court appeared to be referring to the point when the officers got out of their patrol car to approach the juveniles. Later, after stating the officers acted properly in conducting patdown searches of the juveniles, the court stated "it was an investigatory stop." We interpret the court's statements as embracing two rulings: No stop occurred when the officers exited their patrol car and approached the juveniles. A stop did occur when the officers conducted patdown searches of the juveniles.

10

were armed, because gang members tend to arm themselves . . . and based on the crimes that [the officers] had indicated."

DISCUSSION

I.

*Principles of Law Pertaining to Motions to Suppress Evidence Obtained in Alleged Violation of the Fourth Amendment*

The Fourth Amendment prohibits unreasonable searches and seizures by law enforcement personnel. (U.S. Const., 4th Amend.) A temporary stop or detention of a person is a seizure within the meaning of the Fourth Amendment, and a patdown for weapons is a search. (*Terry v. Ohio* (1968) 392 U.S. 1, 16 (*Terry*).)

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." (*Illinois v. Wardlow* (2000) 528 U.S. 119, 123 (*Wardlow*); *Terry*, *supra*, 392 U.S. at p. 30.) To justify a temporary detention of a person, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts," would " 'warrant a man of reasonable caution in the belief' that the [stop] was appropriate[.]" (*Terry*, at pp. 21, 22.)

An officer may conduct a patdown search, also known as a weapons frisk, of a person who has been lawfully detained if the officer has a reasonable suspicion the person is armed and dangerous. (*Arizona v. Johnson* (2009) 555 U.S. 323, 326–327 (*Johnson*).) " '[W]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.' [Citation.] 'The purpose of this

11

limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence[.]' " (*Minnesota v. Dickerson* (1993) 508 U.S. 366, 373.) A patdown is a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." (*Terry, supra*, 392 U.S. at p. 17, fn. omitted.) At the same time, "law enforcement officers have a legitimate need to protect themselves even where they lack probable cause for an arrest. [Citation.] The officer has an immediate interest in taking steps to ensure that the person stopped 'is not armed with a weapon that could unexpectedly and fatally be used' against the officer." (*In re H.M.* (2008) 167 Cal.App.4th 136, 143.) "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." (*Terry*, at p. 24.)

A patdown search for weapons is justified "where the officer 'can point to specific and articulable facts which, considered in conjunction with rational inferences to be drawn therefrom, give rise to a reasonable suspicion that the suspect is armed and dangerous.' " (*In re H.M., supra*, 167 Cal.App.4th at p. 143; see *Terry, supra*, 392 U.S. at p. 21.) "There is no question that 'a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody for the purpose of prosecuting him for a crime.' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1082 (*Mendoza*), quoting *Terry*, at pp. 26–27.) " '[T]he officer need not be absolutely certain that the individual is armed; the crux of the issue is whether a reasonably prudent person in the totality of the

12

circumstances would be warranted in the belief that his or her safety was in danger.' " (*In re H.M.*, at p. 143, quoting *People v. Avila* (1997) 58 Cal.App.4th 1069, 1074; see *Terry*, at p. 27.) "Whether a search is reasonable must be determined based upon the circumstances known to the officer when the search was conducted." (*In re H.M.*, at p. 144.)

Under section 700.1, a juvenile may move to suppress evidence obtained as a result of an unlawful search or seizure. "The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362 (*Glaser*).) We "view the record in the light most favorable to the challenged ruling." (*People v. Smith* (2010) 190 Cal.App.4th 572, 576 (*Smith*); see *People v. Woods* (1999) 21 Cal.4th 668, 673.)[5] Whether

---

5       Gabriel contends we should apply an independent standard of review to the bodycam video footage. He claims we did so in *In re Edgerrin J.*, *supra*, 57 Cal.App.5th at page 760. We decline Gabriel's invitation, which reveals a misunderstanding of appellate standards of review. Appellate standards of review refer to " 'the degree of deference given by the reviewing court to the actions or decisions under review.' " (*San Francisco Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th 653, 667.) When an appellate court reviews a trial court's factual decisions, it applies a deferential substantial evidence standard, drawing all inferences in favor of the court's ruling. (See *In re Edgerrin*, at p. 759.) In doing so, it *considers* the evidence that was presented to the court, but it is the decisions themselves the appellate court *reviews*. That is what we did in *In re Edgerrin*. There, we considered all the evidence before the juvenile court, including bodycam footage, in determining the evidence failed to support the court's conclusion there had been no detention. (*Id.* at pp. 760–761.) This analysis is consistent with substantial evidence review; we considered the

a challenged search or seizure was justified is determined according to federal law.  (*In re Lance W.* (1985) 37 Cal.3d 873, 879, 890.)

II.

*The Juvenile Court Did Not Err in Denying Juan's Suppression Motion*

A.    *Juan's Detention Did Not Violate the Fourth Amendment*

Juan concedes the officers were justified in initially detaining him based on their suspicion he was a minor in possession of marijuana.  We agree.  "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231 (*Souza*).)

Specific, articulable facts justified the officers' decision to detain Juan to investigate Juan's apparent offense.  Morales testified Juan and Gabriel looked young and appeared to be juveniles.  Both officers could see from their vantage point in the patrol car that Juan was openly smoking an unknown substance.  Morales testified the scent of marijuana became detectible as he was talking to the juveniles from his patrol car.  Perrin testified he and Morales thought the lit substance was "possibly marijuana."

Based on these facts, the officers reasonably exited their vehicle to investigate Juan for a possible violation of Health and Safety Code section 11357.  This provision makes it an offense for certain age groups to possess cannabis.  By and large, the offense is an infraction. (See Health & Saf. Code, § 11357, subds. (a)(1) [persons under 18 years of age found in possession of not more than 28.5 grams of cannabis are guilty of an

---

totality of the evidence and found it failed to support the juvenile court's factual finding.

14

infraction], (b)(1) [persons under 18 years of age found in possession of more than 28.5 grams of cannabis guilty of an infraction].) For persons 18 years of age or older, possession of cannabis can be an infraction or a misdemeanor, depending on the person's age and the amount possessed. (See Health & Saf. Code, § 11357, subds. (a)(2) [persons at least 18 years of age but less than 21 years of age found in possession of not more than 28.5 grams of cannabis are guilty of an infraction], (b)(2) [persons 18 years of age or older found in possession of more than 28.5 grams of cannabis "shall be punished by imprisonment in a county jail for a period of not more than six months or by a fine of not more than five hundred dollars ($500), or by both that fine and imprisonment"].) However, as the juvenile court correctly observed, it is of no moment that the apparent offense was "minor." Police officers may lawfully detain individuals suspected of committing infractions.[6] (See, e.g., *Johnson*, *supra*, 555 U.S. at p. 326 [*Terry* stop of car permissible upon police detection of a traffic infraction].)

B.  *The Patdown Search of Juan Did Not Violate the Fourth Amendment*

Juan contends the officers failed to identify specific, articulable facts creating a reasonable inference he was armed and dangerous. We disagree.

The evidence at the suppression hearing established the following specific, articulable facts that, viewed in their totality, justified Officer Perrin in conducting a patdown search of Juan. As the juvenile court found, Juan appeared to be a possible member of the Linda Vista 13 criminal street gang,

---

[6]  Juan's arguments on appeal do not require us to determine the precise point at which his detention occurred. However, Juan was detained at least by the point when Perrin detained him in handcuffs to conduct the patdown search. (See, e.g., *Glaser*, *supra*, 11 Cal.4th at p. 369 [brief handcuffing of the defendant constituted a detention].)

15

a gang known for committing violent crimes. "It is . . . common knowledge that members of criminal street gangs often carry guns and other weapons." (*In re H.M.*, *supra*, 167 Cal.App.4th at p. 146.) The memorial site was located on the 6600 block of Kelly Street, which was considered a territory of the Linda Vista 13 gang.

Not only was the area itself dangerous, but, as the juvenile court also found, the memorial site itself was a kind of landmark where gang members congregated, and was the "exact corner" not only where the memorialized gang member was killed in a homicide, but where there had been multiple shootings since. "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, . . . the fact that the stop occurred in a 'high crime area' " is one of the "relevant contextual considerations in a *Terry* analysis." (*Wardlow*, *supra*, 528 U.S. at p. 124; accord *Souza*, *supra*, 9 Cal.4th at p. 240; see *In re H.M.*, *supra*, 167 Cal.App.4th at p. 145; *People v. King* (1989) 216 Cal.App.3d 1237, 1241 ["[T]hat an area involves increased gang activity may be considered if it is relevant to an officer's belief the detainee is armed and dangerous. While this factor alone may not justify a weapon search, combined with additional factors it may."].) The juvenile court found Juan was wearing loose clothing capable of concealing a weapon. This finding, like the court's other factual findings, was supported by substantial evidence. Although Perrin testified he could see Juan's waistband, he also testified Juan was wearing "loose clothing." The video footage showed Juan was wearing a long t-shirt and jacket that fit the court's description. (See, e.g., *People v. Collier* (2008) 166 Cal.App.4th 1374, 1376, 1378 [officer acted reasonably in conducting patdown search of passenger before searching car interior where car smelled of

16

marijuana and officer was concerned for his safety due to the passenger's size and baggy clothing, which was capable of concealing a weapon]; *United States v. Lamela* (1st Cir. 1991) 942 F.2d 100, 102 [wearing baggy clothing suitable for concealment of contraband, in combination with other factors, may raise reasonable suspicion].) Perrin testified that when Gabriel was discovered to be carrying a gun, Perrin believed Juan could be carrying one as well. (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1082 (*Mendoza*) [officer acted lawfully by detaining and frisking defendant and his two companions, in part because he observed one of the companions wearing a knife in a sheath].) The totality of these circumstances made it objectively reasonable for Perrin to suspect that Juan was armed.[7]

Juan disputes the juvenile court's conclusion that the patdown search of him was justified in several ways. First, he appears to acknowledge there was evidence he was wearing bulky clothing, and that he was present in a "high gang area" and a "[n]eigborhood" known for "[p]ast [c]rimes." However, rather than address these factors in their totality, Juan argues that each of them individually was insufficient on its own to create a reasonable suspicion he was armed and dangerous. This mode of analysis is unpersuasive because

---

[7] As we later discuss, we conclude the patdown search that resulted in the discovery of a firearm on Gabriel also did not violate the Fourth Amendment. However, even if we had determined that Gabriel's patdown search was unlawful, that determination would not affect our analysis of the lawfulness of the patdown search of Juan. Juan had no reasonable expectation of privacy in Gabriel's person and thus could not challenge the use of evidence derived from that search. (See *People v. Madrid* (1992) 7 Cal.App.4th 1888, 1895–1898 [a defendant can "prevail on a 'fruit of the poisonous tree' claim only if he or she has standing regarding the violation which constitutes the poisonous tree," and lacks standing where the initial search did not violate his legitimate expectation of privacy]; *People v. Llamas* (1991) 235 Cal.App.3d 441, 445–446.)

17

it is contrary to the analysis courts are required to employ when determining whether a search was justified. In considering whether the circumstances known or apparent to a police officer justified a patdown search, we must consider all of the circumstances together. We may not "pick[ ] each factor apart separately." (*People v. Fews* (2018) 27 Cal.App.5th 553, 560–561; *United States v. Arvizu* (2002) 534 U.S. 266, 274 [*Terry* precludes a "divide-and-conquer" analysis.].)

Next, Juan argues the officers had "no knowledge" he was a gang member. Juan does not challenge the juvenile court's finding that it was reasonable for the officers to infer that he and Gabriel were possible members of the Linda Vista 13 gang. Instead, his point seems to be that the officers' awareness of the juveniles' status as gang members did not rise to the level of knowledge. This ignores, however, that *Terry* requires reasonable suspicion, not certainty. (*Terry*, *supra*, 392 U.S. at p. 27 ["The officer need not be absolutely certain that the individual is armed[.]"].) A frisk for weapons is justified where the officer " 'can point to specific and articulable facts which, considered in conjunction with rational inferences to be drawn therefrom, give rise to a reasonable suspicion that the suspect is armed and dangerous.' " (*In re H.M.*, *supra*, 167 Cal.App.4th at p. 143; see Evid. Code, § 600, subd. (b) ["An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action."].) Reasonable suspicion is derived from the " 'totality of the circumstances--the whole picture.' " (*Alabama v. White* (1990) 496 U.S. 325, 330.) Although Juan does not contest the reasonableness of the inference identified by the juvenile court—nor does he argue the inference was unsupported by substantial evidence—we observe the juveniles were standing at the memorial site, a site where Linda Vista 13

18

gang members were known to congregate. And moreover, both juveniles simultaneously told the officers they were at the memorial site "paying their respects to *their* [deceased] friend" (italics added), whom the officers knew to be a Linda Vista 13 gang member. The officers could reasonably infer from these facts that the juveniles were possible Linda Vista 13 gang members. (See *In re Michael D.* (2002) 100 Cal.App.4th 115, 126 ["Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence."].)

Juan also disputes whether Perrin could reasonably infer based on Gabriel's possession of a gun that Juan might also have a gun. Juan contends there was "[n]othing in the record" indicating he and Gabriel "were together or involved in some joint operation," such that it was unreasonable for Perrin to suspect, upon learning Gabriel was armed, that Juan might be armed as well. We disagree with Juan's characterization of the record.

The officers testified they observed the juveniles standing near the memorial site between three and five feet apart (according to Perrin) or five feet apart (according to Morales) from one another. Morales testified that when asked what they were doing there, the juveniles "both replied at the same time" that "they were sitting there paying their respects to their friend at the memorial." The juveniles' close proximity to each other, simultaneous response to Morales's question, and possession of a mutual deceased friend to whom they were both paying their respects, all supported the inference they were at the memorial site together. This inference was particularly reasonable when one considers that the memorialized gang member was killed more than two years earlier. It would be a strange coincidence indeed for two juveniles to appear at a memorial site to pay their respects to their mutual deceased friend on the same afternoon more than two years after that

19

friend was killed, if those juveniles had no relationship with one another. A more reasonable inference, and an inference that supports the juvenile court's ruling, is that they were at the memorial site together. (*In re Michael D.*, *supra,* 100 Cal.App.4th at p. 125; *Smith*, *supra*, 190 Cal.App.4th at p. 576 [appellate court must view the record in the light most favorable to the challenged suppression ruling].)

Juan makes certain additional contentions that rely on mischaracterizations of the record. He claims the transcript of the footage from Morales's body-worn camera shows Morales only talked to Gabriel, not Juan. This is misleading, however, because as the prosecutor explained at the suppression hearing, the first two minutes of the footage were silent. Neither the audio portion of the footage, nor the transcription of it, recorded the conversation the officers had with the juveniles before Morales exited the patrol car. Juan also asserts that Perrin "testified that he did not know whether [Juan] knew the memorial victim." This is incorrect. Perrin testified he did not know *how* Juan knew the memorial victim, a very different matter from *whether* Juan knew the memorial victim.

Juan argues he was not uncooperative or evasive, that the crime he was suspected of committing did not involve violence, and that there were no suspicious bulges in his clothing that might have suggested he was hiding a weapon. While such facts might have provided additional grounds for Perrin to reasonably suspect Juan was armed, their absence does not compel the conclusion the patdown was unlawful. Each case must be determined on its own facts. (*People v. Durazo* (2004) 124 Cal.App.4th 728, 735 (*Durazo*) [the determination of reasonableness is "inherently case-specific"].)

In sum, the evidence at the suppression hearing established specific and articulable facts supporting a reasonable suspicion Juan was armed and

dangerous. As a result, the juvenile court properly denied Juan's suppression motion.

## III.

*Officer Morales's Detention and Patdown Search of Gabriel Did Not Violate the Fourth Amendment*

Gabriel contends Officer Morales detained him at the point when Morales grabbed his arm and told him to turn around. He asserts the detention was unreasonable because Morales lacked a reasonable, articulable suspicion he had committed a crime. He further asserts Morales's patdown search was unjustified. We agree with Gabriel that he was detained for purposes of the Fourth Amendment when Morales grabbed him by the arm and told him to turn around for a patdown. A detention occurs within the meaning of the Fourth Amendment when an officer temporarily restrains the individual's liberty by means of physical force or show of authority. (*Brendlin v. California* (2007) 551 U.S. 249, 254; *Mendoza, supra,* 52 Cal.4th at p. 1081.) Morales's actions restrained Gabriel's liberty to a sufficient degree that Gabriel was detained.

We disagree, however, that either the detention or the patdown search was unreasonable under the Fourth Amendment. An articulable suspicion that a person has committed or is about to commit a crime is not the only basis upon which a detention may be deemed reasonable. Federal courts have recognized that a detention may also be justified on the grounds of officer safety. (See *Maryland v. Wilson* (1997) 519 U.S. 408, 414–415 [police could validly order a passenger in a car stopped for a traffic violation to exit the vehicle for reasons of officer safety]; *United States v. Berryhill* (9th Cir. 1971) 445 F.2d 1189, 1193 [holding that "companions of [an] arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the

21

officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed"].)  California courts have recognized this principle as well.  (See *Mendoza*, *supra*, 52 Cal.4th at pp. 1081–1082 [officer's detention and frisk of defendant and his companions justified by safety concerns]; *Glaser*, *supra*, 11 Cal.4th at pp. 360–361 [officers executing a search warrant of a residence were justified in detaining a person who was about to enter the residence for purposes of determining the person's identity and protecting officer safety]; *People v. Rosales* (1989) 211 Cal.App.3d 325, 330–331 (*Rosales*) [officer conducting consensual interview of suspect justified in temporarily detaining the suspect to check for weapons after the suspect's conduct created an appearance of potential danger]; *People v. Hannah* (1996) 51 Cal.App.4th 1335, 1340–1347 [officers executing warrant for arrest of occupant of a residence could validly detain a person visiting the residence to ensure officer safety]; *People v. Samples* (1996) 48 Cal.App.4th 1197, 1206–1207 [detention of defendant who was driving vehicle in which suspects, who were the subjects of an arrest warrant, were passengers, was reasonable in light of driver's association with suspects and in the interest of officer safety].)

*Rosales* and *Mendoza* are instructive.  In *Rosales*, a police officer approached and identified himself to the defendant, a suspected narcotics dealer, intending not to detain the defendant but only to ask the defendant questions.  (*Rosales*, *supra*, 211 Cal.App.3d at p. 328.)  In doing so, the officer noticed the defendant had a bulge in his pants pocket.  The defendant put his hand into that pocket as the officer approached.  The officer grabbed the defendant by the wrist and pulled his hand out of his pocket.  (*Ibid.*)  The officer testified at the suppression hearing that he seized the defendant's hand because he believed it was not uncommon for narcotics dealers to carry

weapons, and he feared the defendant was reaching for a weapon in his pocket. (*Ibid.*) The Court of Appeal held that what began as a consensual encounter "was escalated by defendant's conduct which created an appearance of potential danger to the officer." (*Id.* at p. 330.) When the defendant put his hand into his pocket, the officer "reasonably believed he was, or could be, reaching for a weapon." (*Ibid.*) At that point, the officer had "sufficient grounds to justify a temporary detention to check for weapons." (*Ibid.*)

In *Mendoza*, a police officer was driving his patrol car at 1:30 a.m. when he saw the defendant and two other individuals walking on a lonely industrial street. (*Mendoza, supra*, 52 Cal.4th at p. 1080.) As the officer approached the group on foot and asked how they were doing, the defendant became hostile, and the officer could see that one of the other individuals had a knife attached to his belt. (*Id.* at pp. 1080–1081.) The officer told the defendant and one of the other individuals to sit on the curb while the officer started to conduct a patdown search of the individual who was armed with a knife. (*Id.* at p. 1081.) The California Supreme Court held the officer's detention of the defendant did not violate the Fourth Amendment. (*Ibid.*) "A consensual encounter may turn into a lawful detention when an individual's actions give the appearance of potential danger to the officer." (*Ibid.*, citing *Rosales, supra*, 211 Cal.App.3d at p. 330.) The "sole justification" for such a detention is "protection of the officer and others nearby." (*Mendoza,* at p. 1082.) The Court found the officer acted lawfully because "what began as a consensual encounter turned into a potentially threatening situation . . . when defendant reacted to his friendly approach in a hostile manner." (*Ibid.*) In addition, it was the middle of the night, the officer was outnumbered, one of the individuals was wearing a knife, and the defendant and one of the

other individuals "were wearing clothing loose enough to conceal other weapons, and there was no one in the immediate vicinity who might offer assistance." (*Ibid.*) This evidence "amply" supported the officer's decision to detain the three individuals "to check for other weapons." (*Ibid.*)

Here, Morales detained Gabriel as he was beginning to conduct the patdown search of Gabriel.[8] Under *Mendoza* and *Rosales*, if, at this point, Morales had a reasonable articulable suspicion that Gabriel was armed and dangerous, the detention was justified, and necessarily so was the patdown search.[9] We conclude that he did.

---

[8] Gabriel does not contend, and we do not find, that the officers' interactions with Gabriel prior to the point when Morales detained him for the patdown search implicated the Fourth Amendment. The juvenile court stated the officers "had every right to approach [Juan and Gabriel] and talk to them" to investigate the apparent marijuana offense. We agree with the court on this point. (See, e.g., *Florida v. Royer* (1983) 460 U.S. 491, 497 ["[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen[.]"]; *California v. Hodari D.* (1991) 499 U.S. 621, 624 [drugs abandoned by suspect can lawfully be recovered by the police].)

[9] Although we view Gabriel's detention as primarily justified by concerns of officer safety, we also agree with the People's position the detention was justified by a reasonable suspicion of criminal activity by Gabriel. The juvenile court impliedly found the officers reasonably suspected both youths of smoking an illicit substance. This finding was supported by substantial evidence. Morales testified it was Juan whom he saw smoking the substance that appeared to be marijuana. However, as we have discussed, the evidence before the juvenile court supported the reasonable inference the youths were present at the memorial site together, a commonality giving rise to the reasonable inference both youths may have been engaging in the suspected offense. (See *In re Antonio B.* (2008) 166 Cal.App.4th 435, 441.)

Morales's explanation for his decision to conduct a patdown search, which the juvenile court impliedly credited, was as follows: "I was getting ready to have a conversation and I felt uneasy just knowing my background of the area, knowing how it's a known gang area, it's a big gang hangout, knowing they were at a memorial for a known gang member, and I could visually see 'Linda Vista 13,' 'LV13' tagging all over the sidewalk, and I knew [Gabriel] was wearing a big sweater. [¶] . . . [¶] Gang members are known to carry weapons to defend themselves. A lot of gangs like to retaliate, or especially in that area where it's open, and it's happened before where they were sitting there, paying their respects, and they were attacked by rival gang members, so they're known to carry weapons to defend themselves. So before I continued the conversation, for my safety and my partner's safety, I wanted to do a weapons pat down and make sure there was no firearms, knives, anything that could hurt us." Morales also explained that to talk to Juan, he would have had to cross to the left in front of Gabriel, and Gabriel would then have been to his back or right side. Morales's testimony set forth specific and articulable facts, supported by substantial evidence, that established the reasonableness of his suspicion that Gabriel was armed.

Gabriel argues Morales's suspicion was improperly based on Gabriel's mere presence in a high-crime area, and that nothing about his activities, behavior or appearance supported a suspicion he was armed. (See *People v. Loewen* (1983) 35 Cal.3d 117, 124 [a " ' "high crime area" . . . is not an "activity" of an individual' "].) We disagree. Gabriel told Morales he was at the memorial site to pay respects to his deceased friend, whom Morales knew to be a Linda Vista 13 gang member. Gabriel's statement showed that he was, in fact, engaged in *an activity*: he was purposefully present at the memorial site to pay respects to a deceased gang member. As discussed

above, it was reasonable for Morales to infer Gabriel was himself a possible Linda Vista 13 gang member. And as Morales testified, he was aware that visiting the memorial site to pay respects to the deceased Linda Vista 13 gang member was an activity that posed particular dangers, increasing the likelihood Gabriel would be carrying a weapon to defend himself.

Gabriel also disputes the sufficiency of Morales's testimony to establish the dangerousness of the memorial site. He points out that Morales was unable to be specific about the number of initiations, assaults, and shootings that had occurred since the original 2019 homicide for which the memorial was established. We disagree. Morales testified to his extensive training and experience with gang sets and gang members, including Linda Vista 13. He also testified he was assigned to the Special Operations Unit in April 2021, just six months before Gabriel's arrest. He explained that as part of the Special Operations Unit, he received "constant[ ]" briefings from gang detectives. The briefings included information about "shootings, homicides, robberies" in the areas associated with particular gang sets, including Linda Vista 13. He testified that at the memorial site, in addition to the original homicide and two shootings that came after that homicide, "there's been shootings that were reported but nobody's hit, and also unreported shootings that our detectives told us about." Morales's testimony established that during the six-month period preceding the encounter, there had been multiple shootings at the memorial site. Though he could not be specific about the number of shootings, the fact that there had been multiple recent shootings at that location sufficiently supported the inference the memorial site was a dangerous location.

Gabriel claims his patdown, even if justified, was unnecessary. He claims Morales did not need to bend down and pick up Juan's cigarette to

examine it, because Perrin testified Juan did not dispute that his cigarette contained marijuana. Gabriel claims Morales could have allowed Gabriel to go about his business, or one officer could have directed both juveniles to back up while the other officer "kneeled down, also facing Juan, to pick up the bud."

We disagree with these claims, for several reasons. First, whether or not Morales ultimately opted to investigate Juan's offense by picking up the cigarette and examining its contents, Morales was authorized to approach the area where Juan was standing for the purpose of investigating. (See *Scott v. United States* (1978) 436 U.S. 128, 138 [stating that appellate courts "examin[e] the challenged searches under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved"]; *Rosales*, *supra*, 211 Cal.App.3d at p. 330 [officer initially approached the suspect "with the (aborted) intention to ask some investigatory questions"].) Second, the justification for a detention and search is determined based on the information available to the officer. (*Mendoza*, *supra*, 52 Cal.4th at p. 1082.) Although Perrin testified Juan did not dispute Perrin's statement that he appeared to be smoking marijuana, Gabriel cites no evidence indicating Morales was aware of this fact.

Third, courts do not "lightly second-guess a police officer's decision to perform a patdown search for officer safety. The lives and safety of police officers weigh heavily in the balance of competing Fourth Amendment considerations." (*People v. Dickey* (1994) 21 Cal.App.4th 952, 957.) When Morales conducted the patdown search, he had a reasonable, articulable suspicion that Gabriel was armed. A police officer who possesses such a suspicion has an "*immediate* interest . . . in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that

27

could unexpectedly and fatally be used against him." (*Terry, supra*, 392 U.S. at p. 23, italics added.) " '[W]e must allow those we hire to maintain our peace as well as to apprehend criminals after the fact, to give appropriate consideration to their surroundings and to draw rational inferences therefrom, unless we are prepared to insist that they cease to exercise their senses and their reasoning abilities the moment they venture forth on patrol.' " (*Souza, supra,* 9 Cal.4th at p. 241.) "Failure to cursorily search suspects for weapons in a confrontation situation in an area where gang activity and weapon usage is known from the officers' past experience would be most careless." (*In re Stephen L.* (1984) 162 Cal.App.3d 257, 260.) Telling Gabriel to back up, to "go about his business," or to leave the memorial site would not have neutralized the danger posed by Gabriel's possible possession of a gun, since a gun can inflict injury from a distance. Taking the actions proposed by Gabriel would not have attended to Morales's immediate interest in securing his safety and the safety of his partner, and would have left both officers exposed to the risk of injury.[10] The Fourth Amendment does not require officers "to take unnecessary risks in the performance of their duties." (*In re H.M., supra,* 167 Cal.App.4th at p. 147, citing *Terry*, at p. 23.)

In his reply brief on appeal, Gabriel cites several cases involving patdown searches in an effort to persuade us that his patdown search was

_____

[10]     Gabriel claims Morales's testimony established he conducted the patdown because it is simply his habit and custom to conduct a patdown whenever he detains an individual. This is a mischaracterization of the officer's testimony. The testimony Gabriel is referring to is Morales's testimony explaining he had Gabriel put his hands behind his back for the patdown because this is how Morales generally performs a patdown search. Morales was explaining his usual process for performing a patdown search of an individual; he did not state that he always conducts patdown searches whenever he detains a person for questioning.

unjustified: *In re Jeremiah S.* (2019) 41 Cal.App.5th 299, 306; *In re H.H.* (2009) 174 Cal.App.4th 653, 660; and *People v. Pantoja* (2022) 77 Cal.App.5th 483, 486 (*Pantoja*). However, the determination of reasonableness is "inherently case-specific" (*Durazo, supra*, 124 Cal.App.4th at p. 735), and in each of these cases, the circumstances were materially different from the circumstances presented here. In *In re Jeremiah*, a juvenile who matched the description of a robbery suspect was detained and frisked; the "sum and substance of the case for upholding the search" was that the juvenile was suspected of a robbery, and "robbers tend to have weapons." (*In re Jeremiah*, at pp. 303, 307.) In *In re H.H.*, the officer's sole justification for patting down a juvenile stopped for an equipment violation while riding a bicycle was that the juvenile had not consented to a search. (*In re H.H.*, at pp. 656, 660.) Here, in contrast with these cases, Morales testified to his awareness of facts indicating that Gabriel was a potential gang member present in a particularly dangerous location, and the act in which Gabriel was engaged at that location was one that increased the likelihood he would be armed.

In *Pantoja*, the defendant was pulled over by an officer for a traffic violation as he was pulling into his apartment complex, which was in a high-crime area. (*Pantoja, supra*, 77 Cal.App.5th at pp. 486–487, 492.) After first walking to his patrol car to perform a records search, the officer conducted a patdown search of the defendant based on the defendant's baggy clothing and " 'history of weapons.' " (*Id.* at p. 490.) However, the officer "knew only that defendant had been arrested for possession of a weapon many years ago." (*Id.* at p. 492.) The Court of Appeal affirmed the trial court's ruling granting the defendant's motion to suppress. (*Id.* at p. 490.) The court observed that the defendant's arrest record was stale, and it followed federal authority cited by the defendant establishing that an individual's prior criminal record,

standing alone, is insufficient to create reasonable suspicion. (*Id.* at pp. 490–491.) The court explained the trial court could properly discount the officer's testimony about the defendant's baggy clothing, because the officer did not write in his police report that the defendant's clothes were "suspiciously bulgy or baggy." (*Id.* at p. 490.) The court also reasoned that the defendant's mere presence in a high crime area did not justify the patdown search, particularly "where it appears defendant was stopped as he pulled into his own apartment complex." (*Id.* at p. 492.)

*Pantoja* is distinguishable from this case. Morales, unlike the officer in *Pantoja*, immediately conducted a patdown search of Gabriel upon approaching him. Gabriel, unlike the defendant in *Pantoja*, was not present at his apartment building that happened to be situated in a high crime area. Rather, he was purposefully visiting a memorial site that had particular significance to the Linda Vista 13 criminal street gang, a location known to draw acts of violence. Gabriel was paying respects to the deceased Linda Vista 13 gang member, an activity that increased the likelihood he would arm himself for protection. Unlike *Pantoja*, in which the defendant's arrest history was stale, Morales testified to facts indicating there had been shootings at the memorial site within the preceding six months. Accordingly, Gabriel's citation to *Pantoja* does not persuade us that his detention and patdown search were unreasonable.

In short, Morales's detention and patdown search of Gabriel did not violate the Fourth Amendment. Accordingly, the juvenile court did not err in denying Gabriel's suppression motion.

30

IV.

*Juan's Case Will Be Remanded so the Juvenile Court Can Make an Explicit Declaration Whether Juan's Violation of Penal Code Section 29610 Is a Felony or a Misdemeanor; On Remand, Juan May Seek Correction of the Alleged Sentencing Error Identified by the People*

A.    *The Parties Agree the Juvenile Court Failed to Comply with Section 702*

At a dispositional hearing presided over by Judge Marian F. Gaston, Juan admitted to the allegation in count 1 of the delinquency petition that he violated Penal Code section 29610, unlawful possession of a concealable firearm.  This offense is considered a "wobbler," meaning it is punishable alternatively as a felony or a misdemeanor.  (See *People v. Infante* (2014) 58 Cal.4th 688, 693.)  Under section 702, "If the minor is found to have committed an offense which would in the case of an adult be punishable alternatively as a felony or a misdemeanor, the court shall declare the offense to be a misdemeanor or felony."  (See also Cal. Rules of Court, rule 5.790(a)(1) [juvenile court must "expressly declare on the record" at the dispositional hearing that it has considered whether the juvenile's offense is a misdemeanor or felony, and "must state its finding as to whether the offense is a misdemeanor or a felony"].)

During the dispositional hearing, the juvenile court did not explicitly declare whether the offense was a misdemeanor or a felony, although the minute order summarizing this proceeding refers to the offense as a felony The People concede this was error, and that the error was not harmless.  The parties further agree Juan's case must be remanded so the juvenile court can make the express declaration required by section 702.  (See *In re Manzy W.* (1997) 14 Cal.4th 1199, 1204 [juvenile court must make an "explicit declaration" whether a wobbler is a felony or a misdemeanor]; *In re G.C.* (2020) 8 Cal.5th 1119, 1125 [declaration must be made "*at or before*

31

*disposition*" (italics added)].)  We agree and will remand the case so the juvenile court can make the required declaration.

B.   *On Remand, Juan May Seek Correction of the Alleged Disposition Error Identified by the People*

In their responsive brief on appeal pertaining to Juan's case, the People raise an alleged disposition error that was not identified or raised by Juan in his opening brief on appeal.  At the dispositional hearing, before Juan admitted the allegation charging him with violating Penal Code section 29610, Judge Gaston advised Juan the maximum period of confinement for that charge is three years.  After Juan admitted the violation, the juvenile court adjudged Juan a ward pursuant to section 602 and placed him on probation, stating:  "Juan will be adjudged a ward under the care, custody and control of probation and today he'll be placed home with his parents."

The People claim the juvenile court erred.  They advise that effective September 30, 2020—before Juan's dispositional hearing took place[11]—Senate Bill No. 823 (2019–2020 Reg. Sess.) took effect and amended section 731.  As amended, section 731 provided, in relevant part, "The court shall not commit a ward to the Division of Juvenile Justice for a period that exceeds the middle term of imprisonment that could be imposed upon an adult convicted of the same offense."  (Stats. 2020, ch. 337, § 28.)  The People further advise that effective May 14, 2021, section 726 was amended.  The People assert the amendment "limited the maximum term of confinement [to the Division of Juvenile Justice] to the middle term of imprisonment which could be imposed upon an adult convicted of the same offense or offenses."  (Stats. 2021, ch. 18, § 7.)

---

[11]    Juan's dispositional hearing took place on November 1, 2021.

32

The People contend the juvenile court's disposition failed to comport with these provisions, as amended, because the court "*listed* the maximum term of confinement using the former version of . . . section 731." (Italics added.) The People contend Juan's actual maximum term was two years. In his reply brief on appeal, Juan responds to the People's claim with one sentence: "The Responding Brief . . . helpfully added that remand is necessary to reduce [Juan's] disposition to the middle term of two years under amendments to . . . section 731."

It is unclear from the parties' arguments whether the juvenile court did in fact commit a disposition error, or whether the alleged error was prejudicial. Subdivision (d)(1) of section 726, as amended, states: "If the minor is removed from the physical custody of the minor's parent or guardian as the result of an order of wardship made pursuant to Section 602, the order shall specify that the minor may not be held in physical confinement for a period in excess of the middle term of imprisonment which could be imposed upon an adult convicted of the offense or offenses which brought or continued the minor under the jurisdiction of the juvenile court." (Stats. 2021, ch. 18, § 7; Stats. 2022, ch. 58, § 39.) Here, the juvenile court did not remove Juan from the physical custody of his parents. Section 731, as amended, provides in relevant part: "The court shall not commit a ward to the Division of Juvenile Justice for a period that exceeds the middle term of imprisonment that could be imposed upon an adult convicted of the same offense." (§ 731, subd. (b).) The juvenile court did not commit Juan to the Division of Juvenile Justice.

Ultimately, this issue was not raised by the appealing party, and it has not been fully briefed to this court. We are already remanding Juan's case so the juvenile court can correct the disposition by expressly declaring whether

33

Juan's offense is a misdemeanor or felony, a declaration that may further affect the maximum period of confinement for the offense. On remand, Juan may raise the alleged error identified by the People and seek correction of the disposition on this ground. (See, e.g., *In re Ricky H.* (1981) 30 Cal.3d 176, 191 [error in juvenile court's dispositional order imposing three-year midterm instead of four-year upper term on assault offense, as required by section 726, resulted in an unauthorized sentence correctable at any time; because the lower court had not declared whether the offense was a misdemeanor or felony, the appropriate disposition was to "remand with directions to the superior court, rather than appellate correction"].)

## DISPOSITION

The judgment in *People v. Gabriel M.* (case no. JCM244027 01) is affirmed.

The juvenile court's ruling on the motion to suppress in *People v. Juan A.* (case no. JCM244028 01) is affirmed. The disposition in *People v. Juan A.* (case no. JCM244028 01) is reversed, and the matter is remanded so the juvenile court can expressly declare whether Juan's violation of Penal Code section 29610 is a misdemeanor or felony. On remand, Juan may raise the alleged dispositional error identified by the People on appeal and seek correction of the disposition as stated in this opinion. The judgment in *People v. Juan A.* (case no. JCM244028 01) is otherwise affirmed.

34

DO, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.