Filed 1/16/26  1000 Friends Protecting Historic Benicia v. City of Benicia CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| 1000 FRIENDS PROTECTING HISTORIC BENICIA,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>CITY OF BENICIA,<br><br>  Defendant and Respondent;<br><br><br>KEITH ROGAL et al.,<br><br>  Real Parties in Interest and Respondents. | A172005<br><br>(Solano County Super. Ct. No. FCS059252) |

In August 2022, the City of Benicia (City) approved two housing developments pursuant to Government Code section 65913.4, which sets forth a streamlined ministerial review process for qualifying multifamily housing projects.  (*Id*., subds. (a), (u); undesignated statutory references are to this code.)  A determination that a development application "is subject to the streamlined ministerial approval process" is "not a 'project' as defined" under the California Environmental Quality Act (CEQA).  (§ 65913.4, subd. (o).)  1000 Friends Protecting Historic Benicia (1000 Friends) — a nonprofit corporation formed in November 2022 and consisting of City

1

residents — filed a petition for a writ of mandate to set aside the approvals. It argued the projects do not qualify for review under section 65913.4 and the City thus violated CEQA by failing to prepare or review environmental review documents for the projects. The trial court rejected these arguments. We do too and affirm.

## BACKGROUND

The City contains remnants of the "U.S. Benicia Arsenal," originally used as a military reserve in the 1800s. It was later named the Benicia Arsenal Historic District (Arsenal District), listed in the National Register of Historic Places, and designated as a California state historical landmark. The Arsenal District is comprised of three clusters of historic buildings. One is the Officers' Row, which consists of several buildings — such as a fortress overlooking the Carquinez Strait, a commander's residence, and three additional officers' residences — in a straight line along Jefferson Street. It also contains a former parade ground, described as open space, and stairways.

In 2017, the Legislature enacted Senate Bill No. 35 (2017–2018 Reg. Sess.), authorizing applicants who propose multifamily housing development that satisfies certain planning objectives to pursue a ministerial approval process and excusing them from a seeking a conditional use permit — a permit using zoning and planning principles but for which approval is discretionary. (Stats. 2017, ch. 366, § 3, eff. Jan. 1, 2018; § 65913.4, subd. (a); *McCorkle Eastside Neighborhood Group v. City of St. Helena* (2018) 31 Cal.App.5th 80, 85.) As relevant here, such a development must be in a locality that has failed to provide its share of the regional housing needs by income category. (§ 65913.4, subd. (a)(4)(A)(i)(I).) The development also must be, among other things, a multifamily housing development containing

2

at least two units with a certain percentage of low-income units; sited in urbanized area zones or designated by the general plan for residential or mixed use. (*Id*., subds. (a)(1)–(5).) Development on certain sites is further restricted. For example, development may not be located on a site that requires the demolition of a historic structure, or on wetlands or habitat for protected species. (*Id*., subds. (a)(6)(C), (J), (a)(7)(C).) The determination that an application for a development "is subject to the streamlined ministerial approval process" is "not a 'project' as defined" under CEQA — a statutory scheme requiring public agencies to refrain from approving development projects with significant effects on the environment, i.e., substantial or potentially substantial, adverse change in the environment. (§ 65913.4, subd. (o); Pub. Resources Code, §§ 21000, subd. (g), 21080, subds. (a)–(d); Cal. Code Regs., tit. 14, § 15382.)

The City passed a resolution acknowledging its insufficient progress toward satisfying the need for moderate-income regional housing. It approved use of the ministerial approval process for proposed developments with at least 10 percent affordability. In January 2021, real parties in interest Gina Cooper and Orchard Crossing, Inc. (collectively, Orchard Crossing) submitted a notice of intent and, several months later, a development application under section 65913.4 to construct the Park Road project. The project includes a 14-unit apartment complex comprised of two, two-story buildings with a mix of two- and three-bedroom units. Three of the units would be deed restricted to low-income housing. The proposed development site is a vacant parcel in the northwest corner of Park Road and Jefferson Street, located within the Officers' Row.

Initially, the City determined the Park Road project was inconsistent with section 65913.4 eligibility requirements, including objective zoning,

subdivision, and design standards. Orchard Crossing submitted an updated plan with minor changes to correct those deficiencies. After reviewing the revised plans, the City deemed them consistent with all objective standards. It issued a permit under section 65913.4, finding the Park Road project was exempt from CEQA.

In November 2021, real parties in interest Keith Rogal and Rogal & Associates (Rogal) submitted a development application for the Jefferson Ridge project — 121 condominium units within three-story town house-style buildings in eight clusters, and one 2,000 square foot commercial building. Of those units, 10 percent would be deed restricted for very low- and low-income households. The City initially determined the project was inconsistent with certain objective planning standards, but it later approved the permit under section 65913.4 and found the project exempt under CEQA.

1000 Friends notified the City of its intent to appeal the approval of both projects to the city council under Public Resources Code section 21151 — the provision governing appeals of the adoption of a negative declaration or determination that a project is exempt from CEQA. But the City explained the projects were approved under section 65913.4, which does not permit any additional time for appeals, and, in any event, the time for the City to consider a potential appeal had already passed. 1000 Friends petitioned for a writ of mandate under Code of Civil Procedure section 1094.5, alleging the City violated CEQA by approving the projects. It also argued that a determination that a project is not subject to CEQA may be appealed to the agency's elected decision-making body. (Pub. Resources Code, § 21151, subd. (c).) Finally, it alleged the projects would result in the demolition of historic structures within the Arsenal District, were sited on wetlands and habitats

4

suitable for protected species, and did not comply with applicable municipal code requirements, thus failing to satisfy criteria for ministerial processing.

The trial court denied the petition. It concluded CEQA administrative appeal procedures in Public Resources Code section 21151 do not apply to the ministerial approval of projects, such as those under section 65913.4. It further concluded neither project requires the demolition of a historic structure and there was no substantial evidence of any wetland, protected species, or likelihood of any habitat for protected species currently existing at the proposed sites.

## DISCUSSION

1000 Friends challenges the denial of its writ petition and argues that the Jefferson Ridge and Park Road projects do not qualify for streamlined ministerial review under section 65913.4. We are unpersuaded.

The Legislature has determined California faces a housing affordability crisis driven by a lack of housing as a result of the "underproduction of housing of all types." (§§ 65584.08, subd. (a)(1), 65589.5, subd. (a)(2)(A).) There is a "severe shortage of affordable housing, especially for persons and families of low and moderate income." (§ 65913, subd. (a).) Each locality must adopt a comprehensive, long-term general plan, including a "housing element" to address housing needs. (*California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 444.) To encourage the development of new housing, the Legislature sought to "[e]xpedite the local and state residential development process." (§ 65913, subd. (a)(1).) It enacted Senate Bill No. 35 to facilitate the construction of new housing subject to a "streamlined, ministerial approval process," "not subject to a conditional use permit" if it satisfies statutorily enumerated objective planning standards. (§ 65913.4, subd. (a); Stats. 2017, ch. 366, § 3, eff. Jan. 1, 2018.)

5

Among those objective planning standards, the development must be "a multifamily housing development that contains two or more residential units." (§ 65913.4, subd. (a)(1).) It must be located on a site "zoned for residential use or residential mixed-use development," or "has a general plan designation that allows residential use or a mix of residential and nonresidential uses," with at "least two-thirds of the square footage of the development . . . designated for residential use." (*Id.*, subd. (a)(2)(C).) In addition, the development must be "consistent with objective zoning standards, objective subdivision standards, and objective design review standards in effect at the time that the development is submitted to the local government pursuant to this section." (*Id.*, subd. (a)(5).) The local government "shall approve the development" if the planning director or equivalent position "determines that a development submitted pursuant to this section is consistent with [these] objective planning standards." (*Id.*, subds. (c)(1), (d)(1).)

We review the City's decisions approving the developments under the traditional mandamus provisions in Code of Civil Procedure section 1085. The City's determination does not involve any "personal or subjective judgment by a public official," and the standards are "uniformly verifiable by reference to an external and uniform benchmark." (§ 65913.4, subd. (a)(5).) Development applicants and public officials both know the objective standards. (*Ibid.*) Local government *must* approve a development if it is "consistent with the objective planning standards" — that is, "there is substantial evidence that would allow a reasonable person to conclude that the development is consistent with the objective planning standards." (*Id.*, subds. (c)(1), (3).) There does not appear to be any " 'discretion in the determination of facts . . . vested in' " the government. (*Citizens for East*

6

*Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 571.) Thus, a decision approving the projects under section 65913.4 is a quasi-legislative determination reviewable under the more deferential traditional mandamus standard in Code of Civil Procedure section 1085, not Code of Civil Procedure section 1094.5 as 1000 Friends insists. (*San Francisco Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th 653, 667; *Citizens for East Shore Parks*, at p. 571.) Its petition does not challenge the results of an administrative hearing for which Code of Civil Procedure section 1094.5 would apply. (*Danser v. Public Employees' Retirement System* (2015) 240 Cal.App.4th 885, 890; Code Civ. Proc., § 1094.5, subd. (a) [administrative mandamus only governs judicial review after an administrative order "made as the result of a proceeding in which by law a hearing is required to be given"].) We cannot identify — and 1000 Friends fails to cite — any provision that requires the City to have an administrative hearing before approving the project under section 65913.4.

Traditional mandamus under Code of Civil Procedure section 1085 requires the petitioner to demonstrate the agency's decision was arbitrary, capricious, or lacking in evidentiary support, or that the agency failed to follow procedures or give required notices, a deferential standard of review. (*San Francisco Fire Fighters Local 798 v. City and County of San Francisco*, *supra*, 38 Cal.4th at pp. 667–668; *Ruegg & Ellsworth v. City of Berkeley* (2021) 63 Cal.App.5th 277, 298 (*Ruegg*).) On appeal, the standard of review is the same as the one employed by the trial court — whether the City abused its discretion by approving the projects under section 65913.4. (*Ruegg*, at p. 298.) Issues of law are reviewed de novo. (*Citizens for East Shore Parks v. State Lands Com.*, *supra*, 202 Cal.App.4th at p. 573 [noting no distinction between the standards of review on issues of law in either traditional

7

mandamus and administrative mandamus proceedings under Code Civ. Proc., § 1094.5 since both "embrace review for legal error, including procedural irregularity"].)  And where a petitioner's challenge in a mandamus action "rests on claimed insufficiency of the evidence," we do "not have the power to judge the intrinsic value of the evidence or to weigh it." (*Better Alternatives for Neighborhoods v. Heyman* (1989) 212 Cal.App.3d 663, 672.) "Instead, review is limited to determining whether substantial evidence supports the administrative body's findings." (*Ibid*.)

## I.

Proposed projects are not entitled to approval under section 65913.4 if they "would require the demolition of a historic structure that was placed on a national, state, or local historic register." (§ 65913.4, subd. (a)(7)(C).)  1000 Friends argues the projects violate this criterion.  Relying on various historic preservation laws, it contends the definition of "historic structure" includes "historic districts."  It notes the Arsenal District is listed on the National Register of Historic Places and the State Office of Historic Preservation, and the Officers' Row satisfies various state and federal preservation laws' definition of "historic structure or district."  On that basis, it argues both are protected "historic districts."  Because the proposed projects would require building *within* these districts — 1000 Friends reasons — the projects would "demolish the connective structure" of the districts by breaking up and destroying their linkage and visible context.  As a result, the projects are not entitled to ministerial review.  After independently reviewing this issue of statutory interpretation, and giving the statute's words their ordinary meaning, we disagree.  (*Ruegg, supra*, 63 Cal.App.5th at p. 301.)

Section 65913.4 does not define the term "structure."  The lack of a statutory definition indicates the Legislature intended to give that term its

8

plain and commonsense meaning. (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1083.) "To determine the common meaning, a court typically looks to dictionaries." (*Consumer Advocacy Group, Inc. v. Exxon Mobil Corp.* (2002) 104 Cal.App.4th 438, 444.) Black's Law Dictionary defines "structure" as "[a]ny construction, production, or piece of work artificially built up or composed of parts purposefully joined together." (Black's Law Dict. (12th ed. 2024).) Another definition is "something (such as a building) that is constructed." (Merriam-Webster Dict. Online (2026) <https://www.merriam-webster.com/dictionary/structure> [as of Jan. 16, 2026].) So defined, the statute prohibits demolition of an individual construction.

Thus, the Arsenal District — an area 1000 Friends identifies as consisting "of multiple interrelated buildings" and structures that functioned as an interconnected whole — is not a "structure." As it concedes, the district is comprised of a *collection* of structures, including several buildings that were formerly officers' quarters. That the buildings within the Arsenal District have a "*pattern of organization*" or a "clear relationship" with each other does not render the buildings "joined together" under the Black's Law Dictionary definition, as it insists. (Italics added.) More importantly, it concedes the projects would not require the demolition of *any* historic building. That the Arsenal District itself has been placed on the National Register of Historic Places is irrelevant. "[S]tructure[s]," not districts, are entitled to protection from demolition under section 65913.4. (*Id.*, subd. (a)(7)(C).) Nor are the stairways within the Arsenal District structures protected under section 65913.4 — they do not appear on any historical register. (*Ruegg, supra*, 63 Cal.App.5th at p. 306 ["The section 65913.4, subdivision (a)(7)(C) exception is for a 'structure' placed on a historical

register, not for a site where a structure once existed"].)  Likewise, the Officers' Row consists of a collection of "individual buildings," the former parade ground, and land that 1000 Friends identifies as "open space" that was "never developed."[1]  The area itself is not an "historic structure" within the meaning of section 65913.4.

Relying on definitions in historical preservation statutes, 1000 Friends urges us to broadly define "historic structure" to include historic districts and interrelated sites.  (E.g., Health & Saf. Code, § 18955 [defining "qualified historical building or structure" as "any structure or property, collection of structures, and their related sites deemed of importance to the history, architecture, or culture of an area by an appropriate local or state governmental jurisdiction"]; Pub. Resources Code, § 5024, subd. (h) [defining "structure" under the state-owned historical resources list as "an immovable work constructed by man having interrelated parts in a definite pattern of organization and used to shelter or promote a form of human activity and which constitutes an historical resource"].)  Specifically, it argues the state historical building code protects " 'qualified historical building[s] or structure[s]' " that exist on a variety of places such as "historical or architecturally significant sites, places, historic districts, or landmarks." (Health & Saf. Code, § 18955.)  A "historic district" is "a definable unified geographic entity that possesses a significant concentration, linkage, or continuity of sites, buildings, structures, or objects united historically or aesthetically by plan or physical development."  (Pub. Resources Code,

---

[1] 1000 Friends also contends that connecting sidewalks and a portion of a tennis court are part of this historic district.  We see nothing in the record — and 1000 Friends fails to identify anything — to support this assertion.

10

§ 5020.1; see also 36 C.F.R. § 60.3 [historic district is "a geographically definable area, urban or rural, possessing a significant concentration, linkage, or continuity of sites, buildings, structures, or objects united by past events or aesthetically by plan or physical development. A district may also comprise individual elements separated geographically but linked by association or history"].) Based on the protections the Legislature afforded historic districts, 1000 Friends argues it must have intended section 65913.4's protection of "historic structure[s]" to encompass "historic districts."

Reliance on preservation statutes to define the term "structure" is misplaced. (*Ruegg*, 63 Cal.App.5th at pp. 303–304.) These statutes "highlight the importance state and local government has attached to historical preservation," affording "protection to historical and cultural resources." (*Ibid.*; Health & Saf. Code, § 18953 [State Historical Building Code provides "means for the preservation of the historical value of qualified historical buildings or structures"].) Section 65913.4, however, "is not a historical preservation statute." (*Ruegg*, at p. 303.) Rather, it is intended "to expedite approval of affordable housing developments." (*Ruegg*, at p. 304.) The "historic structure exception in section 65913.4 indicates the Legislature did not intend to require ministerial approval of affordable housing projects at the expense of all historical preservation." (*Ibid.*) It is limited, and "cautions against giving that exception its broadest possible meaning." (*Ibid.*) Thus, we will not construe the term "historic structure" in section 65913.4 to include "historic district."

This reading comports with the statute's purpose and "is consistent with other provisions." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) Interpreting the term "historic structure" narrowly obeys the Legislature's stated intention that section 65913.4 "be interpreted and implemented in a

manner to afford the fullest possible weight to the interest of, and the approval and provision of, . . . housing." (§ 65913.4, subd. (u).) Further, subdivision (e)(1)(B) expressly limits parking requirements for section 65913.4 developments in a "historic district." (§ 65913.4, subd. (e)(1)(B) [local government "shall not impose automobile parking standards for a streamlined development that was approved" when the "development is located within an architecturally and historically significant *historic district*" (italics added)].) Reading the statute as a whole, section 65913.4 contemplates streamlined approval of developments located in historic districts. (*Lungren*, at p. 735 [statute's "words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible"].) It simply prohibits the demolition of any historic structure, if any, in the historic district. Defining "structure" as "district" would render subdivision (e)(1)(B) superfluous. (*Young v. McCoy* (2007) 147 Cal.App.4th 1078, 1083 [courts must avoid statutory interpretations that render any part of a statute as superfluous].)

Because 1000 Friends's argument fails at the first hurdle — the Arsenal District and Officers' Row are not historic structures — we do not address its argument that the projects would demolish these districts by destroying the linkage and visible context, and block views between buildings.

II.

The City determined the National Wetlands Inventory does not identify any wetlands within the boundaries of the proposed Jefferson Ridge project. It also determined the Jefferson Ridge and Park Road projects were proposed on sites surrounded by development and that had been previously developed — they were not located on sites containing a protected species

12

habitat. 1000 Friends contends there is unrefuted evidence of wetlands on the Jefferson Ridge project site and biological resources in both the proposed project areas — section 65913.4 prohibits development on such areas. Thus, it argues the City abused its discretion by approving the projects. We disagree. 1000 Friends has not demonstrated " 'there is no possible substantial evidence whatsoever to support' " the City's findings. (*Alameda Health System v. Alameda County Employees' Retirement Assn.* (2024) 100 Cal.App.5th 1159, 1177–1178.)

First, proposed developments are eligible for ministerial review if the "development is not located on a site" that is "[w]etlands, as defined in the United States Fish and Wildlife Service Manual." (§ 65913.4, subd. (a)(6)(C).) That manual defines wetlands as "lands transitional between terrestrial and aquatic systems where the water table is usually at or near the surface or the land is covered by shallow water." (U.S. FWS (1993) Wetlands Classification System, § 2.5 (A), at <https://www.fws.gov/policy-library/660fw2> [as of Jan. 16, 2026].) Specifically, wetlands must have one or more of the following three attributes: "(1) at least periodically, the land supports predominantly hydrophytes (plants specifically adapted to live in wetlands); (2) the substrate is predominantly undrained hydric (wetland) soil; and (3) the substrate is nonsoil and is saturated with water or covered by shallow water at some time during the growing season of each year." (*Ibid*.)

None of those attributes apply to the proposed Jefferson Ridge site. According to an environmental site assessment regarding the topographic, geologic, and hydrogeologic characteristics of Jefferson Ridge — located north of Adams Street and east of Park Road — the "property is located in one of [the City's] small urban watersheds," a "region draining into a body of water." Two sections of the site contain well-drained soil, consisting primarily of clay

13

loam and weathered bedrock.  The third section contains silty clay with a low filtration rate.  Although the report notes one section of the property has hydrologic soils of the type associated with high water tables, we do not interpret this — nor does 1000 Friends argue — as equivalent to the substrate being nonsoil and saturated with, or covered by, water so as to demonstrate the presence of wetlands.

Moreover, the report did not indicate the site contained land supporting predominately plants adapted to live in wetlands.  Instead, it "is dominated by a single vegetation community; ruderal vegetation."  Far from supporting wetland plants, the property site "has been subject to annual vegetation clearing to reduce fire hazards."  And while the assessment identified several areas of wetlands listed on the National Wetlands Inventory — one along the northern border of the project site that 1000 Friends concedes is within one-half mile north of the project site and large numbers of wetlands far south in the Carquinez Strait — none of them are *within* the proposed development site.  A stormwater control plan for the Jefferson Ridge project confirmed there are no existing wetlands from which the project site must have setbacks.  Substantial evidence supports the City's finding the Jefferson Ridge project is not located on a site that is wetlands.

Citing an alleged 2007 draft environmental impact report (EIR) by the City for a proposed "Lower Arsenal" mixed-used specific plan, 1000 Friends insists the Jefferson Ridge site contains seasonal wetlands.  This argument — based on a narrow portion of the record — ignores the standard of review.  We do not overturn decisions supported by substantial evidence "merely because a contrary finding would have been equally or more reasonable."  (*Ogundare v. Department of Industrial Relations* (2013) 214 Cal.App.4th 822, 829–830.)  More importantly, its argument

14

misrepresents the record. Rather than citing an EIR, 1000 Friends cites a 2022 letter from a City resident on behalf of the Benicia Arsenal Park Task Force and Benicia Arsenal Defense — in opposition to the Jefferson Ridge project — that simply describes the alleged draft report for a specific plan that the City never adopted. Critically, the record does not contain the draft EIR. And 1000 Friends fails to identify any draft report specifically addressing the Jefferson Ridge project — the project at issue here. Nor did it request judicial notice of the draft EIR. So we do not consider it. (*Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632 ["As a general rule, documents not before the trial court cannot be included as part of the record on appeal and thus must be disregarded as beyond the scope of appellate review"].)

Moreover, substantial evidence supports the City's finding that neither project site is a "[h]abitat for protected species identified as candidate, sensitive, or species of special status by state or federal agencies, fully protected species, or species protected by" the federal Endangered Species Act of 1973, the California Endangered Species Act, "or the Native Plant Protection Act." (§ 65913.4, subd. (a)(6)(J); 16 U.S.C. § 1531 et seq. [Endangered Species Act]; Fish & G. Code, §§ 1900 et seq. [Native Plant Protection Act], 2050 et seq. [California Endangered Species Act].) A 2013 biological assessment performed by an environmental consultant reviewed records maintained by the California Natural Diversity Database of the Department of Fish and Wildlife, mapping prepared by the U.S. Fish and Wildlife service, and additional available background information. Among other things, it assessed the area within the City limits for special status plant and animal species. A map identified special status plant species and the likelihood of their occurrence within the area, not simply the small

15

coastal shoreline, as 1000 Friends contends. Notably, no protected species were found in the area of either project site. Although the map identifies the habitat of the Carquinez Goldenbush — deemed a rare and endangered plant by the California Native Plant Society's Rare Plant Inventory— as having the greatest likelihood of occurrence within the project sites, the assessment found there was no likelihood of the species occurrence on the site. Indeed, there was no suitable habitat for that plant species within the City limits. The assessment explained that "[p]ast development has eliminated suitable habitat for special-status species in upland areas," i.e., the areas for the proposed projects.

1000 Friends asserts the map demonstrates the Suisun song sparrow — identified as a special concern species by the Department of Fish and Wildlife — is potentially present on both project sites. We see no such indication. The report explained the sparrow was found in Southampton Bay and Suisun Marsh, not the project sites. Specifically, the marshland and exposed shoreline provided a suitable habitat for various special status plants and bird species. To the extent 1000 Friends again relies on the 2022 project opposition letter referencing a 2007 draft EIR to argue there is the potential for special status plant and animal species to occur, we disregard this reference for the same reasons previously set forth. And in any event, this alleged evidence does not indicate any protected species were located on either site, only that they had the potential to occur. In sum, we find the City's conclusion the project sites are not habitats for protected species is supported by substantial evidence. (*Better Alternatives for Neighborhoods v. Heyman*, *supra*, 212 Cal.App.3d at pp. 672–673.) Consequently, its decision approving the projects was not an abuse of discretion. (*Ibid*.)

16

III.

Section 65913.4 requires developments be consistent with objective zoning standards, objective subdivision standards, and objective design review standards — "standards that involve no personal or subjective judgment by a public official and are uniformly verifiable by reference to an external and uniform benchmark or criterion" such as those in overlay zones, specific plans, and inclusionary zoning ordinances — in effect at the time the development is submitted to the local government, or at the time a notice of intent is submitted, whichever occurs earlier. (*Id.*, subd. (a)(5).) The statute requires a local agency to approve a proposed development if it is "consistent with the objective planning standards" — that is, if "there is substantial evidence that would allow a reasonable person to conclude that the development is consistent with the objective planning standards." (*Id.*, subds. (c)(1), (3).) 1000 Friends contends both projects are inconsistent with the objective planning and zoning requirements embodied in the Benicia Municipal Code and Arsenal Historic Conservation Plan (Conservation Plan). Thus, the City abused its discretion by approving the projects for streamlined review. We disagree.

The Benicia Municipal Code specifies that commercial office districts are intended to "[p]rovide opportunities for residential development" on commercial development sites or "separate sites in certain commercial districts." (Benicia Mun. Code, § 17.28.010, subd. (A)(6).) They further "[e]nsure the provision of adequate off-street parking and loading facilities." (*Id.*, subd. (A)(7).) But those districts are subject to certain land use regulations, including not permitting residential uses on the ground level. (*Id.*, § 17.28.020.) 1000 Friends argues Jefferson Ridge — a proposed development of 121 condominium units within three-story buildings with off-

17

street parking, a multifamily residential use in a commercial office zoning district — violates Benicia Municipal Code provisions prohibiting ground-level residential development in commercial districts. Citing to nothing in the record, 1000 Friends argues the private, attached garages on the ground level of these condominiums are for residential use since they will be used for storage and weight training, in addition to parking. And even if some of the ground-level garage space is used for parking, it is nonetheless part of the private multifamily residential use.

No. Like statutes, we independently review municipal ordinances. (*Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 434.) But we defer to the City's interpretation of its own ordinance " 'unless it is clearly erroneous or unauthorized.' " (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1193 [describing standard for deference to an agency's interpretation of its own regulations].) We afford greater deference to an agency's interpretation where, as here, " 'the agency has expertise and technical knowledge,' " regarding zoning requirements " 'especially where the legal text to be interpreted is . . . entwined with issues of fact, policy, and discretion.' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12.) The " 'agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' " (*Ibid*.) Deference is also appropriate if there are indications "the agency's interpretation is likely to be correct." (*Id*. at pp. 12–13.)

In 2005, the City interpreted parking as an accessory use and therefore authorized in a commercial zoning district despite placement on the ground level. (Benicia Mun. Code, § 17.28.020 [identifying "[a]ccessory use[]" as "use classifications permitted on the site of a permitted use, but requiring a use

18

permit on the site of a conditional use" in commercial office districts].)
Deference to this interpretation is appropriate. The restrictions on
residential uses in commercial districts are intertwined with issues of " 'fact,
policy, and discretion' " regarding zoning ordinances and the impact to those
areas. (*Yamaha Corp. of America v. State Bd. of Equalization*, *supra*,
19 Cal.4th at p. 12.) "Moreover, the City is familiar with the rationale for the
ordinance, is responsible for its implementation, and has special knowledge
about the 'practical implications' of possible interpretations." (*Berkeley Hills
Watershed Coalition v. City of Berkeley* (2019) 31 Cal.App.5th 880, 896, fn.
omitted.) There are also "indications of careful consideration by senior
agency officials" regarding this interpretation. (*Yamaha*, at p. 13.) The city
council adopted this interpretation after considering an appeal involving, in
part, the development of proposed construction of residential units with
garages on the ground level in a commercial district. It was not an
interpretation contained in " 'an advice letter prepared by a single staff
member.' " (*Ibid*.) Nor is there any indication in the record that the City has
vacillated on this interpretation — it is the same interpretation the City
proffers here on whether parking in a garage attached to a residential unit is
appropriate under commercial zoning district regulations. (*Ibid*.)
Accordingly, Jefferson Ridge's proposed garages on the ground level do not
violate the City's objective standards.

Next, 1000 Friends contends both projects are inconsistent with
objective standards for preserving historic sight lines. According to the
Conservation Plan, a view corridor is a cone of vision originating from a
specific point along a roadway. Sight lines are narrow corridors defined by a
straight line originating from a specific point and terminating at a given
feature or building. The plan adopted policies to "[m]aintain designated sight

19

lines to landmark building," and where "view corridors are indicated, it is important to maintain a direct sight line to all landmark structures and important natural features which fall within the view angle." (Italics omitted.) The policies expressly authorize new development within designated view corridors, noting simply that it "should be of a scale that will not overpower or dominate views of landmarks." (Italics omitted.)

In addition, the Conservation Plan identifies special review areas, which includes the National Register of Historic Places — "four distinct historic districts of national significance" listed on the National Register in 1976. The special review areas were designated "to ensure that the landscape features, views and physical settings of historic buildings" are "maintained to the maximum extent feasible." According to the Conservation Plan, communities that receive federal assistance must "consider the effects of projects on these districts." Relevant here, the plan identifies "[s]ignificant view corridors and sight lines . . . found both within the Arsenal and from point outside." Among them are view 6 — a sight line from Jefferson Street at "Business Park Entry Road" to the former Guardhouse and water beyond. It further identifies the Arsenal District as a "National Register Historic District."

The City determined Jefferson Ridge and Park Road were consistent with these standards. Rogal performed a visual impact study of Jefferson Ridge based on coordinates provided by the objective standards in the Conservation Plan. A photo simulation of several views of Jefferson Ridge — superimposing the proposed development as seen from the precise vantage points identified in the Conservation Plan — reflect that the proposed development maintained direct sight lines to landmark buildings. For example, the shop buildings and Martinez hills beyond remain viewable from

view 5 in the Conservation Plan. The Commandant's Quarters, Clocktower Building, and Promontory — all identified within the view 10 in the Conservation Plan — likewise remain visible. The photo simulation similarly depicts the Guardhouse within the view corridor from view 6 in the Conservation Plan. (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 247.) "This evidence is more than adequate to support the City's conclusion—indeed, any reasonable person's conclusion—that the project[s]" comply with objective standards in the Conservation Plan. (*Save Livermore Downtown v. City of Livermore* (2022) 87 Cal.App.5th 1116, 1127.)

1000 Friends's arguments disputing this conclusion fail to persuade. First, it argues Jefferson Ridge would block all views of the water beyond the Guardhouse. This ignores the standard of review. It is difficult to identify the natural features present in the Conservation Plan pictures taken from those vantage points, and we do not resolve conflicts in the evidence as we lack the power " 'to judge the intrinsic value of the evidence or to weigh it.' " (*California Oak Foundation v. Regents of University of California*, *supra*, 188 Cal.App.4th at p. 247; *Perry v. Stuart* (2025) 111 Cal.App.5th 472, 500.) Moreover, in these circumstances, we implement section 65913.4 "in a manner to afford the fullest possible weight to" the "approval and provision of, increased housing supply." (§ 65913.4, subd. (u).)

Second, citing only a map identifying special review areas and an illustration of views from historic buildings, 1000 Friends asserts "both developments will disrupt the current views and sight lines within the Special Review Areas district boundaries denoted in Figure 7" of the Conservation Plan. As a preliminary matter, we question whether this standard — "maximum extent feasible" — is objective, as it appears to

21

"inherently require personal interpretation and subjective judgment." (*Save Livermore Downtown v. City of Livermore, supra,* 87 Cal.App.5th at p. 1128.) More importantly, leaving aside 1000 Friends's failure to compare those illustrations to the views resulting from proposed projects, nothing in the Conservation Plan *prohibits* disrupting current views and sight lines. Its purpose is to ensure "that the landscape features, views and physical settings of historic buildings" are "maintained to the maximum extent feasible." 1000 Friends's conclusory statement fails to demonstrate the projects do not satisfy this requirement.

Finally, we do not consider 1000 Friends's assertion that the developers made no effort to assess the impacts of the proposed developments on the distinct historic districts as required under the Conservation Plan — an argument it forfeited on appeal by failing to raise it below. (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676.) In any event, it concedes the requirement to consider project impacts is ambiguous. We cannot discern — and 1000 Friends fails to explain — how this requirement is an "objective standard" that proposed developments must satisfy. (*Save Livermore Downtown v. City of Livermore, supra,* 87 Cal.App.5th at p. 1128.)

In sum, there was substantial evidence that would allow a reasonable person to conclude the developments are consistent with objective planning standards, and the City's determinations were not entirely lacking in evidentiary support. (§ 65913.4, subd. (c)(3).) Given this conclusion, we will not vacate the trial court's order denying the petition for a writ of mandate. (*Ruegg, supra,* 63 Cal.App.5th at p. 298.) Nor need we address 1000 Friends's argument that the City violated CEQA by failing to prepare an EIR

22

prior to approving the developments.  The projects were properly approved under section 65913.4.

IV.

1000 Friends contends it was entitled to but denied the right to appeal the City's decisions approving the projects to a local governing body under Public Resources Code section 21151.  Under that provision, if "a nonelected decisionmaking body of a local lead agency" determines that "project is not subject to [CEQA]," that "determination may be appealed to the agency's elected decisionmaking body."  (Pub. Resources Code, § 21151, subd. (c).)  Having independently reviewed this issue of law, we disagree.

Section 65913.4 expressly provides that a "determination of whether an application for a development is subject to the streamlined ministerial approval process" is "not a 'project' as defined" under CEQA.  (§ 65913.4, subd. (o); Pub. Resources Code, § 21065 [defining "[p]roject" under CEQA, in part, as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment"].)  CEQA further provides that it "does not apply" to "[m]inisterial projects proposed to be carried out or approved by public agencies."  (Pub. Resources Code, § 21080, subd. (b); *City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1421.)  Ministerial projects involve "only the use of fixed standards or objective measurements, and the public official cannot use personal, subjective judgment in deciding whether or how the project should be carried out."  (Cal. Code Regs., tit. 14, § 15369; *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 117.)  As 1000 Friends concedes, a proposed development's eligibility for ministerial review under section 65913.4 is based on "a long list of objective standards."  Harmonizing these statutes is thus unnecessary because there is

23

no inconsistency between the two. (*State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 955.) Under both section 65913.4 and CEQA, Public Resources Code section 21151 — part of CEQA — does not apply to the determination that a development is subject to the section 65913.4 approval process at issue here.

This reading comports with the legislative history of section 65913.4. (*Becerra v. Superior Court* (2020) 44 Cal.App.5th 897, 920 [examining the legislative history " 'to confirm our plain-meaning construction of [the] statutory language' "].)[2] Senate Bill No. 765 (2017–2018 Reg. Sess.) amended that provision to ensure "that an application for an SB 35 development is not a 'project' as defined in CEQA and therefore shall not trigger a CEQA review." (Sen. Rules Com., Off. of Sen. Floor Analyses, Sen. Bill No. 765 (2017–2018 Reg. Sess.) Stats. 2018, ch. 840, § 2, Aug. 31, 2018, p. 6.) Guidelines promulgated by the Department of Housing and Community Development — noting that CEQA does not apply to the "determination of whether an application for a development is subject to the Streamlined Ministerial Approval Process" — confirms our reading. (§ 65913.4, subds. (m)(3) [" 'Department' means the Department of Housing and Community Development"], (n) ["The department may review, adopt, amend, and repeal guidelines to implement uniform standards or criteria that supplement or

---

[2] During the briefing of this appeal, Rogal asked us to take judicial notice of the petition for peremptory writ of mandate and legislative history of Senate Bill Number 35. We deferred ruling on this unopposed motion, which we now deny as unnecessary. The petition is available in the appellate record, and motions for judicial notice of published legislative history are unnecessary. (*Wittenburg v. Beachwalk Homeowners Assn.* (2013) 217 Cal.App.4th 654, 665, fn. 4.) " 'Citation to the material is sufficient.' " (*Ibid.*)

24

clarify the terms, references, or standards set forth in this section"]; *Western Oil & Gas Assn. v. Air Resources Board* (1984) 37 Cal.3d 502, 520 ["contemporaneous construction of a statute by an administrative agency charged with its enforcement, the [agency's] view is entitled to great weight"].) 1000 Friends's assertion that a determination a proposed development qualifies "for ministerial review is precisely the type of determination made subject to" an appeal under Public Resources Code section 21151 has no merit. The Legislature expressly placed that determination beyond the purview of CEQA and its administrative appeal provision.

None of 1000 Friends's cited authorities alter this conclusion. Notably, *McCorkle Eastside Neighborhood Group v. City of St. Helena, supra,* 31 Cal.App.5th at page 80 addressed an administrative appeal from a determination that a proposed project fell within an infill exemption under CEQA guidelines and was thus exempt from CEQA review. (*McCorkle,* at pp. 86, 91–92.) There was no determination that project opponents were entitled to an appeal under Public Resources Code section 21151. Rather, the court noted the opponents appealed the planning commission's decision regarding the CEQA exemption, as well as the demolition and design review permit approvals as appealable to the city council under various provisions of the city's municipal code. (*McCorkle*, at p. 87, fn. 2.) In *California Renters Legal Advocacy & Education Fund v. City of San Mateo* (2021) 68 Cal.App.5th 820, which addressed issues related the Housing Accountability Act, the court determined an " 'action involving only the nondiscretionary application of objective standards' does not entitle neighboring landowners" to the traditional due process protections of notice and opportunity to be heard before a project's approval. (*California*

25

*Renters*, at p. 853.)

We reject 1000 Friends's additional argument that, in the absence of administrative rather than judicial review, the governing body would be "compelled to approve a development project based solely on unsupported consistency findings or the discretion of its planning director or equivalent." Like the court in *California Renters*, we "are untroubled by" its suggestion that if a "member of the governing body opines that a project complies with objective standards then the local agency would be compelled to find it so." (*California Renters Legal Advocacy & Education Fund v. City of San Mateo*, *supra*, 68 Cal.App.5th at p. 852.) As 1000 Friends acknowledges, section 65913.4 requires consistency determinations to be supported by substantial evidence. (§ 65913.4, subds. (c)(1), (3).) Substantial evidence is evidence that is " ' "reasonable in nature, credible, and of solid value" and " 'substantial' proof of the essentials which the law requires in a particular case." ' " (*California Renters*, at p. 852.) Section 65913.4 further applies an objective standard — that "there is substantial evidence that would allow a reasonable person to conclude that the development is consistent with the objective planning standards." (§ 65913.4, subds. (c)(1), (3); *California Renters*, at p. 852.) "There is thus no basis for concern that section [65913.4] would require project approval based solely on the unsupported opinion of a single person, or on evidence that a reasonable person would not find credible and persuasive." (*California Renters*, at p. 852.)

## DISPOSITION

The judgment is affirmed. The City and real parties in interest are entitled to their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

26

_____
RODRÍGUEZ, J.

WE CONCUR:


_____
FUJISAKI, Acting P. J.


_____
PETROU, J.


A172005; *1000 Friends Protecting Historic Benicia v. City of Benicia*